126 P.3d 370

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Arthur BIRANO, Defendant–Appellant,**

**and**

**Nicolas Nakano and Bryce Takara, Defendants.**

**No. 25699.**

Intermediate Court of Appeals of Hawai'i.

Sept. 26, 2005.

As Amended Sept. 28, 2005.

Robert F. Miller, Honolulu, on the briefs, for Defendant–Appellant.

Mangmang Qiu Brown, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

LIM, Acting C.J., FOLEY and NAKAMURA, JJ.

Opinion of the Court by FOLEY, J.

Defendant–Appellant Arthur Birano (Birano) appeals from the Judgment filed on Feb-

**330**

ruary 18, 2003 in the Circuit Court of the First Circuit (circuit court).[1] Birano was charged with and subsequently convicted by a jury of:

Count I: Robbery in the First Degree, in violation of Hawaii Revised Statutes (HRS) § 708–840(1)(b)(ii) (1993 and Supp. 2004) [2];

Count II [3]: Kidnapping, in violation of HRS § 707–720(1)(e) (1993) [4];

Count III: Burglary in the First Degree, in violation of HRS § 708–810(1)(c) (1993) [5];

Counts IV and VI: Possession of a Prohibited Firearm, in violation of HRS § 134–8(a) (1993) [6];

Counts V and VII: Ownership or Possession Prohibited of any Firearm or Ammunition by a Person Convicted of Certain Crimes, in violation of HRS § 134–7(b) and (h) (Supp.2004) [7]; and

1. The Honorable Sandra A. Simms presided.

2. Hawaii Revised Statutes (HRS) § 708–840 (1993 & Supp.2004) provides in relevant part:

> § 708–840 **Robbery in the first degree.** (1) A person commits the offense of robbery in the first degree if, in the course of committing theft:
>
> ....
>
> (b) The person is armed with a dangerous instrument and:
>
> ....
>
> (ii) The person threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property.
>
> (2) As used in this section, "dangerous instrument" means any firearm, whether loaded or not, and whether operable or not, or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or threatened to be used is capable of producing death or serious bodily injury.
>
> (3) Robbery in the first degree is a class A felony.

3. Although Birano was convicted of Count II, Kidnapping, the circuit court dismissed the Kidnapping conviction pursuant to an Interrogatory by which the jury found that the State did not prove beyond a reasonable doubt that Birano acted with separate and distinct intents in committing Robbery in the First Degree (Count I) and Kidnapping; therefore, Count II merged into Count I.

4. HRS § 707–720(1)(e) (1993) provides:

> § 707–720 **Kidnapping.** (1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:
>
> ....
>
> (e) Terrorize that person or a third person[.]

5. HRS § 708–810 (1993) provides in relevant part:

> § 708–810 **Burglary in the first degree.** (1) A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building, with

intent to commit therein a crime against a person or against property rights, and:

> ....
>
> (c) The person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.
>
> ....
>
> (3) Burglary in the first degree is a class B felony.

6. HRS § 134–8 (1993) provides in relevant part:

> § 134–8 **Ownership, etc., of automatic firearms, silencers, etc., prohibited; penalties.** (a) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of any of the following is prohibited: assault pistols, except as provided by section 134–4(e); automatic firearms; rifles with barrel lengths less than sixteen inches; shotguns with barrel lengths less than eighteen inches; cannons; mufflers, silencers, or devices for deadening or muffling the sound of discharged firearms; hand grenades, dynamite, blasting caps, bombs, or bombshells, or other explosives; or any type of ammunition or any projectile component thereof coated with teflon or any other similar coating designed primarily to enhance its capability to penetrate metal or pierce protective armor; and any type of ammunition or any projectile component thereof designed or intended to explode or segment upon impact with its target.
>
> ....
>
> (d) Any person violating subsection (a) or (b) shall be guilty of a class C felony and shall be imprisoned for a term of five years without probation.

7. HRS § 134–7(b) and (h) (Supp.2004) provides:

> § 134–7 **Ownership or possession prohibited, when; penalty.**
>
> ....
>
> (b) No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.
>
> ....
>
> (h) Any person violating subsection (a) or (b) shall be guilty of a class C felony; provided

Count VIII: Carrying, Using, or Threatening to Use a Firearm in the Commission of a Separate Felony, in violation of HRS § 134–6(a) and (e) (Supp.2004).[8]

The circuit court sentenced Birano to the following concurrent terms of imprisonment:

Count I: Extended term of life imprisonment with possibility of parole, with a mandatory minimum sentence of fifteen years for use of a semi-automatic weapon and six years and eight months as a repeat offender;

Count III: Extended term of twenty years of imprisonment, with a mandatory minimum sentence of ten years for use of a semi-automatic weapon and three years and four months as a repeat offender;

Counts IV and VI: Extended term of ten years of imprisonment, with a mandatory minimum of one year and eight months as a repeat offender;

Counts V and VII: Extended term of twenty years of imprisonment, with a mandatory minimum of three years and four months as a repeat offender; and

Count VIII: Extended term of life imprisonment with possibility of parole, with a mandatory minimum sentence of six years and eight months as a repeat offender.

On appeal, Birano contends the circuit court erred by (1) denying his motion for a mistrial and request for a Hawaii Rules of Evidence (HRE) Rule 104 hearing after the circuit court engaged in ex parte communications with the prosecutor, witness/co-defendant Nicolas Nakano (Nakano), and Nakano's attorney in violation of Birano's right to a fair trial; (2) refusing to instruct the jury as to Birano's "claim of right" defense; (3) denying Birano a fair trial by (a) refusing to dismiss juror 17 for cause, (b) refusing to suppress evidence obtained in an illegal search, (c) refusing to dismiss the burglary count as having merged with the robbery count, and (d) allowing the State to elicit prejudicial and inadmissible testimony against Birano; and (4) sentencing Birano to two extended life terms of imprisonment with the possibility of parole, plus mandatory minimums.

We affirm the convictions. Although the circuit court judge engaged in an ex parte communication, Birano was not prejudiced.

**I.**

The charges against Birano arose out of an incident that occurred on May 16, 2001 when Birano [9] pointed a gun at Frederick Dumlao

---

that any felon violating subsection (b) shall be guilty of a class B felony.

8. HRS § 134–6(a) and (e) (Supp.2004) provides:

§ **134–6 Carrying or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty.** (a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not; provided that a person shall not be prosecuted under this subsection where the separate felony is:

(1) A felony offense otherwise defined by this chapter;
(2) The felony offense of reckless endangering in the first degree under section 707–713;
(3) The felony offense of terroristic threatening in the first degree under section 707–716(1)(a), 707–716(1)(b), and 707–716(1)(d); or
(4) The felony offenses of criminal property damage in the first degree under section

708–820 and criminal property damage in the second degree under section 708–821 and the firearm is the instrument or means by which the property damage is caused.
. . . .
(e) Any person violating subsection (a) or (b) shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony.
A conviction and sentence under subsection (a) or (b) shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under subsection (a) or (b) may run concurrently or consecutively with the sentence for the separate felony.
(Brackets omitted.)

9. Birano's two co-defendants in this case, Nicolas Nakano (Nakano) and Bryce Takara (Takara), both pled no contest to their charges.

**332**

(Dumlao) and demanded money from Dumlao.

Prior to trial, Birano filed a Motion to Suppress Evidence (Motion to Suppress). Birano claimed "the police seized and searched [his] property without a warrant." At the hearing on the Motion to Suppress, Birano argued that the "police created their own probable cause" by tearing the second compartment of his backpack to reveal the magazine clip of a gun. The police officers denied tearing the backpack. Birano testified that the last time he had possession of the backpack, the gun was inside the top, zippered, main compartment of the backpack and the backpack was zipped with no rip or tear, and that the ski mask recovered from inside in the backpack was not his. The circuit court denied the Motion to Suppress, finding that the police officers' version of events was more credible then Birano's version and the police did not fabricate the probable cause for the search warrant.

Jury selection began on September 11, 2002. The circuit court read a list of potential witnesses to the jury, and none of the jurors indicated that he or she recognized any of the names. Many of the jurors indicated they knew people or had relatives who were employed by law enforcement agencies, but all the jurors stated they would not have a difficult time making a decision based on the evidence produced during trial and the instructions on the law.

One of the prospective jurors was called as juror number 17 (Juror 17). Juror 17 informed the circuit court that he "didn't think this matter's [sic] in my ability to make a judgment but you should probably know I'm an administrator at Chaminade" and that the University of Chaminade had "the largest criminal justice program in the state." Juror 17 testified that, as a dean of the graduate school, he ran the criminal justice program. At Chaminade, Juror 17 dealt with police officers, forensic specialists, prosecutors, and defense attorneys who had participated in, were involved with, or taught in the program. Juror 17 said he thought one or two of the police officers' names on the witness list sounded familiar and might have been former students, but he was not sure. He also

admitted he might be "predisposed probably to accept their testimony." However, Juror 17 said he thought he could make a decision based "just on the evidence and the law" and believed he could be a "fair and impartial juror." Juror 17 also stated that he would advise the circuit court if he recognized any of the witnesses. Birano challenged Juror 17 for cause because Juror 17 was "predisposed." The circuit court judge denied the request, stating that Juror 17's "indication with regard to predisposition doesn't necessarily go to his not being able to assess the credibility. When I asked him those questions, he understood that and he'd be able to set that aside."

During trial, two jurors were excused. After one alternate had been seated and the circuit court had ruled that the second alternative was to be seated, Juror 17 informed the circuit court that he had recognized one of the witnesses, Honolulu Police Department (HPD) criminalist Curtis Kubo (Kubo). Juror 17 informed the court that Kubo had taught part-time at Chaminade four years ago and Juror 17 recognized Kubo because Juror 17 had signed Kubo's contract. Juror 17 explained that Chaminade hired 160 people every 10 weeks, he delegated the responsibility of checking out potential instructors to the persons doing the hiring, and he would not have looked at Kubo's resume before signing off on Kubo's contract. Juror 17 informed the circuit court that after Kubo testified, Juror 17 went back and checked his records to make sure Kubo was "the right person" and to see how recently Kubo had taught at Chaminade. Juror 17 testified that Kubo had not taught at Chaminade for about four years. Juror 17 stated that he had met Kubo professionally at annual faculty receptions at Chaminade, but he did not know Kubo personally and would not have interacted with Kubo four years ago. He also testified he did not believe his recognition of Kubo would affect his ability to be fair.

Birano requested a mistrial, which the circuit court denied, finding there was no personal relationship between Juror 17 and Kubo and Juror 17's knowledge of Kubo did not affect his ability to be fair and impartial.

Dumlao testified that on May 16, 2001, he was unloading laundry from his car in the parking lot of his apartment building with his girlfriend, Cari–Ann Casil (Casil), and his friend Brian, when a red Camaro pulled up behind and blocked in Dumlao's car. Birano got out of the Camaro and walked up to Dumlao. Birano had an "uzi" and was accompanied by two males (Nakano and Bryce Takara (Takara)), one of whom was wearing a ski mask. Birano told Dumlao to take him up to Dumlao's apartment and open Dumlao's safe. Dumlao testified he was scared because Birano had a gun pointed at him, so he did what Birano told him to do. Dumlao's neighbor came out to see if everything was all right, and Dumlao said he was "all right" because he did not want to get his neighbors involved. When Dumlao entered his apartment, he noticed the glass door to the balcony was open so he ran out to the balcony, climbed over to his neighbor's balcony, and slid down to the first floor. Dumlao ran to the street and called the police. Dumlao testified that prior to May 16, 2001, he did not know Birano, Nakano, or Takara.

On cross-examination, Dumlao denied that, on May 15, 2001 at the Makiki Market Village, Birano had given him $2,500.00 for drugs and he was supposed to return with the drugs and failed to do so. Dumlao also denied that, in the parking lot on May 16, Birano demanded his money back and Dumlao told Birano that Dumlao had the money. Dumlao admitted that the videotape played to the jury showed Dumlao swinging his arms back and forth and walking very casually past his neighbors' apartment, but Dumlao testified he felt threatened the entire time. Dumlao testified that on May 16, 2001, he did not recognize Birano even though, prior to May 16, he had once been introduced to Birano by his friend, Joseph Poomaihealani (Joseph). Dumlao denied that in a telephone conversation with Joseph several days after May 16 he had admitted it was his fault for everything that happened on May 16 with Birano. Dumlao also denied that any drug transaction with Birano happened on May 15, 2001.

When Nakano was called to testify for the State, he invoked his Fifth Amendment right to remain silent. The prosecutor requested a bench conference and informed the circuit court judge that the prosecutor had met with Nakano "this morning, and it went fine. He was supposed to testify. And I don't know." The circuit court judge recessed and had Nakano's attorney called to come immediately to court. After the circuit court judge held a meeting in chambers with the prosecutor, Nakano, and Nakano's attorney, Nakano decided to testify. Birano's attorney objected to not being allowed to attend the meeting in chambers and asked for a mistrial, claiming that an ex parte communication had occurred with the judge because the prosecutor was allowed to attend the meeting while Birano and his attorney were excluded. The circuit court denied Birano's request for a mistrial, finding that the meeting was not an ex parte communication because Nakano was a defendant in the case and was represented by counsel. The circuit court granted the State's oral motion in limine to exclude questioning of Nakano by Birano's counsel about Nakano's reasons for pleading the Fifth Amendment and then changing his mind. Birano's counsel objected.

Nakano testified that on May 16, 2001 he met Takara at Makiki Village and told Takara he wanted to smoke dope. Birano was also there, and Nakano walked over and introduced himself to Birano; Nakano had never met Birano before. It was Takara's idea to go to Dumlao's residence to get the dope. Birano, Takara, and Nakano discussed that they were going to "take dope" from Dumlao.

Birano, Takara, and Nakano got in Birano's Camaro, drove down Kewalo Street to Dumlao's apartment building, turned into the parking lot, and parked behind Dumlao's car. Dumlao and his girlfriend were getting out of their car with a laundry basket. Nakano testified that Birano got out of the car, walked over to Dumlao, and put a black "machine gun" to Dumlao's head. Nakano identified State's Exhibit 18 as the black "machine gun" Birano was holding. State's Exhibit 18, a S.W.D. [Model] 11 semiautomatic firearm (the SWD 11) was received in evidence. Nakano testified he "panicked" when he saw Birano point the SWD 11 at

Dumlao's head and Dumlao's girlfriend ran away when Birano pointed the SWD 11 at Dumlao's head.

Nakano testified that when he approached Dumlao he was wearing a face mask that Takara had given him in the car. Birano told Dumlao to take him to Dumlao's safe. Dumlao took the three men up the stairs to the third floor to his apartment. Dumlao's neighbor opened the door and asked if everything was all right, and Nakano told her "yeah." When they reached Dumlao's apartment, Dumlao tried to walk away, but Birano made Dumlao come back and told him to open the door or he would shoot Dumlao. Dumlao unlocked the door and ran into the apartment. Birano, still holding the SWD 11, entered behind Dumlao, then Takara, and lastly Nakano. Nakano did not see Dumlao after Dumlao entered the apartment. When Nakano entered the apartment, he was carrying the mask; he put the mask on and then took it off. Nakano testified that Birano told him to search the house, and the three of them searched, but they did not find anything of value to take. Birano, Takara, and Nakano went back to the Camaro and drove way because they thought Dumlao would call the police. Nakano testified that Birano told him that he was going to "shoot us out of it" if the police came. Nakano admitted he was "high" on crystal methamphetamine during the incident.

Casil testified that when she saw Birano point the SWD 11 at Dumlao, she ran screaming towards her upstairs apartment. She did not go to her apartment, but jumped off the second floor railing and went to a neighbor's apartment where she called the police and told the police she thought her boyfriend had been shot. She testified she was scared when she saw the SWD 11 pointed at Dumlao.

Rei Kobayashi (Kobayashi) and her boyfriend, Ruben Cruz (Cruz), were Dumlao's neighbors on May 16, 2001. Kobayashi testified she woke up "to a woman screaming" and "heard ... banging noises." Cruz testified he heard people walk by their apartment and stop at Dumlao's apartment and then he heard voices getting louder and louder. Cruz and Kobayashi both testified that they opened their door and saw Dumlao surrounded by three males. Kobayashi testified she asked Dumlao if everything was okay and Dumlao answered "yes." Cruz testified that Dumlao looked worried, but Cruz did not see a gun.

Police Officer Vargas (Vargas) testified that on May 16, 2001, he was a member of the Specialized Services Division (SWAT team) and had been assigned to locate and arrest Birano on a parole retake warrant. While Vargas, Sergeant De Mello (De Mello), and Officer Kiho (Kiho) were checking places where Birano usually hung out, they received a radio call that Birano was possibly at his parents' house. Vargas testified that as they drove past the entrance/exit of Birano's parents' house, he noticed a black vehicle moving slowly towards School Street. The officers were dressed in their SWAT gear with the word "Police" on the front and back of their vests. Vargas testified they parked their vehicle right past the entrance/exit and he and De Mello proceeded on foot towards the black vehicle. Vargas testified he drew his weapon because he had information that Birano was armed and dangerous and word "on the street" was that "Birano said he wasn't going to be taken alive and he was going to shoot it out with the police."

Vargas testified that as he approached the black vehicle, he said, "Police, stop, and get out of the vehicle." The driver of the vehicle obeyed, but Birano came out of the driver's side back door, made eye contact with Vargas, and then ran, clutching a black bag (backpack), towards a canal at the back of the parking lot. Vargas and De Mello chased after Birano. Birano jumped over a chain link fence, fell onto the embankment, and then fell about twenty feet into the canal. Birano got up and ran up the canal. Vargas testified that he saw the backpack on the embankment, so he stayed with the backpack while De Mello got into the canal and chased Birano. Vargas noticed a tear in the backpack and a pistol-type magazine sticking out of the tear. Based on his training and experience, Vargas believed there was a gun inside the backpack. Vargas handed the backpack over to Detective Hamasaki (Hamasaki). Vargas identified State's Exhibit

32 as the backpack he recovered; State's Exhibit 32 was moved into evidence. Vargas testified that from the time he had the backpack in his custody until he gave it to Hamasaki, he did not tamper with or tear the backpack in any way.

Hamasaki testified he received the backpack from Vargas and noticed a firearm magazine sticking out from a hole in the backpack. Hamasaki took the backpack to the police station and prepared the search warrant, which was signed by the on-duty judge. Hamasaki testified that Police Officer Sellers (Sellers) executed the search warrant on the backpack. Hamasaki testified that while the backpack was in his custody he did not open or tear the backpack nor tamper with any of the evidence in any way.

Sellers testified that on May 16, 2001, he retrieved the backpack from an evidence locker and noticed "a long extended magazine protruding out of the front portion of the backpack" from a "cut-open space just above the middle portion of the middle zipper" of the backpack. Sellers and Officer Maluenda removed a "Mac 11 sole weapon" (the SWD 11) from the backpack and then removed the magazine from the SWD 11 and a nine millimeter round from the chamber of the SWD 11. Sellers testified that from the time he took custody of the backpack until he turned it over to the evidence technician neither he nor Officer Maluenda ripped or tore the backpack or tampered with any of the evidence in any way.

Kubo testified that he was a criminalist for the HPD crime lab and worked in the Firearms Unit of the Scientific Investigation Division. The circuit court qualified Kubo as an expert in the field of firearms and ballistics. Kubo testified that on May 18, 2001 he test-fired the SWD 11 and found the SWD 11 to be in operating condition.

During trial, the parties stipulated, among other things, that (1) on May 16, 2001, Birano was the owner of the black "Eastpak" backpack recovered by the police on the same date; (2) evidence from the execution of the search warrant on the backpack consisted of sunglasses, a dark blue ski mask, the SWD 11, a plastic magazine that fit into the SWD 11, thirty cartridges headstamped "WIN 9mm LUGER" that were recovered from the plastic magazine of the SDW 11, and one cartridge removed from the chamber of the SWD 11 headstamped "WIN 9mm LUGER"; and (3) Birano had prior felony convictions that prohibited him from owning, possessing, or controlling any type of firearm or ammunition.

Birano's witness, Joseph, testified that Birano was a childhood friend of his. Joseph was also a friend of Dumlao and had introduced Dumlao to Birano in 2000. Joseph testified he called Dumlao one or two days after the May 16, 2001 incident and Dumlao said he and Birano were going to do a drug transaction, he had taken Birano's money, and what had happened on May 16 had been his fault.

Birano took the stand and admitted he had the SWD 11 when he confronted Dumlao and he was not supposed to carry a gun. Birano testified that on May 14 he had given Dumlao money for drugs, but Dumlao never returned with the drugs. Birano stated that he was mad and just wanted his money back from Dumlao and he went to Dumlao's apartment on May 16 to get back his money. Birano testified that when he got out of the car at Dumlao's, he had the SWD 11 out, but not pointed at Dumlao, and was yelling at Dumlao that he wanted his money from Dumlao. Birano testified that Dumlao said "the thing stay upstairs." Birano put the SWD 11 in his pants when he saw that Dumlao did not have a gun. Birano went upstairs with Dumlao because he assumed Dumlao had his cash and he was going to get it back. Birano testified he did not tell Dumlao to open Dumlao's front door or threaten Dumlao to get him to open the door, he was not trying to kidnap or terrorize Dumlao, and he did not threaten to shoot Dumlao. When Dumlao stepped back after opening the door, Birano pulled out the SWD 11 and told Dumlao not to play games. Birano testified that after Dumlao jumped off the balcony, he did not search or take anything from the apartment even though he had a chance to do so. Birano stated that Takara and Nakano searched and made the mess in Dumlao's apartment and he did not stop them.

The jury found Birano guilty as charged in all counts. (Count II was dismissed because it merged with Count I.) Judgment was filed on February 18, 2003. Birano timely appealed.

## II.

### A. Ex Parte Communication

█ Birano contends he was denied a fair trial when the circuit court denied his motion for a mistrial and request for an HRE Rule 104 [10] hearing after the circuit court judge engaged in an in-chambers, ex parte communication with the prosecutor, the State's lead prosecution witness Nakano, and Nakano's attorney without the presence of Birano's attorney. After the in-chambers meeting, the circuit court addressed the parties without the jury present:

> THE COURT: Good afternoon, [Counsel for Birano] and Mr. Birano.
>
> The Court will note, also, the presence of ... counsel for Nakano, who is present and that the jury is not present.
>
> We're having this conference just before the jury comes in. Before, when we took our recess, Mr. Nakano, who had been called as a witness by the State, invoked his—well, basically invoked the Fifth Amendment. [Nakano's Counsel] was not present at that time. He was on his way. He is counsel for Mr. Nakano, who was a co-defendant in this case.
>
> Following that, the Court met in chambers with [the prosecutor] and with [Nakano's counsel], who spoke with his client and indicated that, you know, he was afraid, which I think is clear. He's very very afraid. And so after that, he met with him again. And this is where we are now.
>
> I know [Counsel for Birano] indicated that he wanted to be present during the course of that meeting with [Nakano's counsel] and [the prosecutor] and because the Court was—basically wanted to understand what had occurred between counsel and Mr. Nakano that required him to change his mind rather abruptly and not testify at that point or at least invoke the Fifth Amendment Right. So I know [Counsel for Birano] indicated his objection to not being present at that.
>
> [Nakano's counsel] wanted to be able to, I guess, say what he needed to say about what his client intends. So I did allow that to occur. Of course, the Prosecutor was present. [Counsel for Birano] was not. And I know you [Counsel for Birano] object to that, so let the record note you objected to that.

Birano requested a mistrial, arguing that the communication was ex parte because the prosecutor was at the meeting and was privy to communication to which Birano was not a party and he was concerned about what went on in the meeting since prior to the meeting Nakano had pled the Fifth Amendment and then, after the meeting, changed his mind and decided to testify. The judge stated that it was not an ex parte communication "in that the Prosecutor was present. Mr. Nakano is a defendant in this case, and he's represented by counsel." The judge also stated she was not informed during the meeting as to whether Nakano would testify, the question of any deal between the State and Nakano was not part of the discussion, and the court

---

10. Hawaii Rules of Evidence Rule 104 provides:
 **Rule 104 Preliminary questions.** (a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (b). In making its determination the court is not bound by the rules of evidence except those with respect to privileges.
 (b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

(c) Hearing of jury. Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require or, when an accused is a witness, if the accused so requests.
(d) Testimony by accused. The accused does not, by testifying upon a preliminary matter, subject oneself to cross-examination as to other issues in the case.
(e) Weight and credibility. This rule does not limit the right of a party to introduce before the jury evidence relevant to weight or credibility.

clerk was at the meeting so the "minutes [were] there that the discussion took place." The circuit court denied Birano's motion for a mistrial and did not hold an HRE Rule 104 hearing.

Birano contends the circuit court judge violated Canons 2(A) and 3(B)(7) of the Code of Judicial Conduct, claiming impropriety and impermissible ex parte communication. Canon 2(A) provides:

**CANON 2. A JUDGE SHALL AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY IN ALL OF THE JUDGE'S ACTIVITIES.**

A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Canon 3(B)(7) provides:

**CANON 3. A JUDGE SHALL PERFORM THE DUTIES OF JUDICIAL OFFICE IMPARTIALLY AND DILIGENTLY.**

. . . .

**B. Adjudicative Responsibilities.**

. . . .

(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:

(a) Where circumstances require, ex parte communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided:

(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and

(ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.

(b) A judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.

(c) A judge may consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities or with other judges.

(d) A judge may initiate or consider any ex parte communications when expressly authorized by law to do so.

■ An ex parte communication is defined as "[a] generally prohibited communication between counsel and the court when opposing counsel is not present." *Black's Law Dictionary* 597 (7th ed.1999); *see also State v. Thomas,* 268 Neb. 570, 580, 685 N.W.2d 69, 79 (2004).

■ An ex parte communication does not automatically entitle a defendant to receive a new trial. *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). In *Rushen,* the Supreme Court determined that the "*ex parte* communication [between judge and juror] was innocuous. They did not discuss any fact in controversy or any law applicable to the case" and the "state courts had convincing evidence that the jury's deliberations, as a whole, were not biased by the undisclosed communication." *Id.* at 121, 104 S.Ct. at 457.

In *LaChappelle v. Moran,* 699 F.2d 560 (1st Cir.1983), the First Circuit Court of Appeals held that "ex parte communications between a judge and a witness are not per se unconstitutional" and "our review should be limited to whether or not the judge's actions were so egregious and fundamentally unfair as to deprive the defendant of his constitutional rights." *Id.* at 566. In *LaChappelle,* the trial judge met with a minor witness to determine whether the witness was not being truthful or was just embarrassed because she had to testify against her father in a sexual assault case. *Id.* at 567. The First Circuit determined that the communication between the trial judge and minor witness was ex parte, but such communication did not

"erode[ ] the defendant's ability to have a fair trial." *Id.*

■ The State concedes the communication was ex parte, but argues that the communication did not deny Birano's right to a fair trial. "[R]eversal on the grounds of judicial bias or misconduct is warranted only upon a showing that the trial was unfair. Unfairness, in turn, requires a clear and precise demonstration of prejudice." *Aga v. Hundahl,* 78 Hawai'i 230, 242, 891 P.2d 1022, 1034 (1995) (citations omitted).

Since we hold the communication was ex parte, we must determine whether there is a reasonable possibility that the ex parte communication contributed to Birano's conviction. *State v. Pauline,* 100 Hawai'i 356, 378, 60 P.3d 306, 328 (2002). "If there is such a reasonable possibility in a criminal case, then the [ex parte communication] is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside." *State v. Gano,* 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999) (internal quotation marks and citation omitted).

Nothing in the record demonstrates that the meeting induced Nakano to testify against Birano or that any kind of deal was struck (which was Birano's concern). The circuit court was not aware of Nakano's decision to testify at the time Birano requested a mistrial:

> THE COURT: . . . During the time that the Court met with counsel and with [the prosecutor] and [Nakano's counsel], I was not informed whether or not Mr. Nakano was going to be testifying or not. I don't know that at this point.
>
> . . . .
>
> THE COURT: . . . If there's any question about any deals, that was not part of the discussion.

**11.** HRS § 708–834 (1993) provides in relevant part:

> **§ 708–834 Defenses: unawareness of ownership; claim of right; household belongings; co-interest not a defense.** (1) It is a defense to a prosecution for theft that the defendant:
> (a) Was unaware that the property or service was that of another; or
> (b) Believed that the defendant was entitled to the property or services under a claim of

The circuit court disclosed to Birano what had occurred in chambers. Birano has not challenged the representations made by the circuit court judge. Nakano's testimony as to the events of May 16, 2001, was substantially consistent with Birano's testimony. Birano himself testified that he confronted Dumlao with a loaded gun.

In the instant case, there is "convincing evidence that the jury's deliberations, as a whole, were not biased by the undisclosed communication," making the ex parte communication harmless error. *Rushen,* 464 U.S. at 121, 104 S.Ct. at 457. The circuit court judge's actions in allowing this ex parte communication were not "so egregious and fundamentally unfair as to deprive the defendant of his constitutional rights." *LaChappelle,* 699 F.2d at 566. Based on the totality of the evidence presented, there is no reasonable possibility that the error complained of contributed to the conviction. *Pauline,* 100 Hawai'i at 378, 60 P.3d at 328. Therefore, the communication did not erode Birano's ability to have a fair trial. *LaChappelle,* 699 F.2d at 567.

## B. Jury Instructions

■ Birano contends the circuit court erred by refusing to instruct the jury as to Birano's claim of right defense.[11] Birano contends he was entitled to the claim of right defense because his defense was that he gave Dumlao the money for drugs and since Dumlao did not return with the drugs, he was entitled to get back his money.

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.

> right or that the defendant was authorized, by the owner or by law, to obtain or exert control as the defendant did.
> . . . .
> (4) In a prosecution for theft, it is not a defense that the defendant has an interest in the property if the owner has an interest in the property to which the defendant is not entitled.

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

Error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Valentine,* 93 Hawai'i 199, 204, 998 P.2d 479, 484 (2000) (internal quotation marks, citations, and brackets omitted; block quote format changed) (quoting *State v. Cabrera,* 90 Hawai'i 359, 364–65, 978 P.2d 797, 802–03 (1999)).

■ Birano contends he was prejudiced by the absence of the jury instruction on claim of right because it was his money.[12] In a criminal trial, an "accused is entitled to an instruction on every defense supported by the evidence, no matter how inconclusive the evidence may be, provided that evidence would support consideration of that issue by the jury." *State v. McMillen,* 83 Hawai'i 264, 265, 925 P.2d 1088, 1089 (1996). Birano did not request a jury instruction for claim of right, but argues that it should have been given.

In *McMillen,* the defendant punched the victim in the face after he mistakenly thought the victim had taken his friend's backpack. *Id.* at 264, 925 P.2d at 1088.

McMillen requested that the circuit court give jury instruction 7.03 from the *Hawaii Standard Jury Instructions—Criminal,* Vol. I (Dec.1991), on claim of right. *McMillen,* 83 Hawai'i at 264, 925 P.2d at 1088. However, the circuit court refused the instruction because the accompanying commentary to instruction 7.03 stated that the "Committee was unable to agree as to whether this instruction could be utilized in a robbery prosecution." *Id.* at 265, 925 P.2d at 1089. The Hawai'i Supreme Court agreed, holding that the HRS " § 708–834 claim of right defense to theft does not apply in a prosecution for robbery." *McMillen,* 83 Hawai'i at 267, 925 P.2d at 1091.

Birano contends the State agreed that the claim of right defense applied:

[PROSECUTOR]: ... I indicated to [Counsel for Birano] that all along, really *the defense has wanted to argue claim of right, and it doesn't apply in the case law for robbery.* But because the court is letting in the included of attempted theft, whether it's [fourth degree] or [second degree], claim of right will apply to those. And so I think you have to give that.

THE COURT: Give what?

[PROSECUTOR]: The claim of right defense. But *make it clear that it's only as to the theft* should they come back with that, because I think it does apply.

THE COURT: I don't think it does, counsel. You know, it's an affirmative defense which, in this instance, if-the case law is simply that attempted theft generally is a lesser included offense of robbery. In this instance, there are, you know, allegations and testimony with regard to what was said at the time that the defendant allegedly accosted Mr. Dumlao.

(Emphasis added.)

The State argued that the claim of right

---

12. HRS § 701–115 (1993) states in relevant part:

§ 701–115 Defenses. (1) A defense is a fact or set of facts which negatives penal liability.

(2) No defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented. If such evidence is presented, then:

(a) If the defense is not an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in the light of any contrary prosecution evidence, raises a reasonable doubt as to the defendant's guilt[.]

. . . .

(3) A defense is an affirmative defense if:

(a) it is specifically so designated by the [Hawaii Penal] Code or another statute; or

(b) If the Code or another statute plainly requires the defendant to prove the defense by a preponderance of the evidence.

defense applied to theft, not to robbery.[13] Birano was charged and convicted of robbery, not theft. The jury instructions were not prejudicially insufficient or erroneous as to the robbery charge.

## C. Fair Trial

Birano contends the circuit court denied him a fair trial by (a) refusing to dismiss Juror 17 for cause, (b) refusing to suppress evidence obtained in an illegal search, (c) refusing to dismiss the burglary conviction as having merged into the robbery conviction, and (d) allowing the State to elicit prejudicial and inadmissible testimony.

### 1. The circuit court did not err by not dismissing Juror 17 for cause.

Birano contends the circuit court was required to dismiss Juror 17 for cause because Juror 17 stated in voir dire that he was predisposed to believe police officers and because during trial Juror 17 recognized one of the State's witnesses. Birano also contends the circuit court erred because Juror 17 admitted that after he recognized Kubo, he went to his office and looked at Kubo's records.

Hawai'i appellate courts review a trial court's decision to pass a juror for cause under the abuse of discretion standard. *State v. Kauhi,* 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (internal quotation marks and citation omitted).

There are two kinds of challenges to jurors: "for cause" and peremptory. "In all cases, any party may challenge for cause any juror drawn for the trial." Hawaii Revised Statutes (HRS) § 635–28 [ (1993) ]. "For cause" includes challenges to the "juror's qualifications, interest, or bias that would affect the trial of the cause and . . . *to any matter that might tend to affect the proposed juror's verdict.*" HRS § 635–27 [ (1993) ]. A peremptory challenge is "[t]he right to challenge a juror without assigning, or being required to assign, a reason for the challenge." *Black's Law Dictionary* 1136 (6th ed.1990). *State v. Carvalho,* 79 Hawai'i 165, 170 n. 4, 880 P.2d 217, 222 n. 4 (App.1994) (emphasis added).

Juror 17 stated he knew Kubo professionally, not personally; had not interacted with Kubo; and did not believe his recognition of Kubo would affect his ability to be a fair juror. Nothing in the record indicates that Juror 17 was biased or prejudiced because of his job. He ran the criminal justice program at Chaminade and, in that capacity, had contact with police officers, forensic specialists, prosecutors, and defense attorneys. Juror 17 testified that he had checked Kubo's record to determine if he recognized Kubo as "the right person" and when Kubo last taught at Chaminade. Birano fails to point out how he was substantially prejudiced by Juror 17 remaining on the jury. Therefore, the circuit court did not err by allowing Juror 17 to remain on the jury and by denying Birano's motion for mistrial.

Birano also contends he was entitled to a mistrial because two other jurors were dismissed for knowing a witness and/or speaking to police officers and replaced by alternate jurors. These claims are without merit. Nothing in the record indicates the dismissed jurors prejudiced the rest of the jury.

### 2. The circuit court did not err in denying Birano's Motion to Suppress.

Birano contends the circuit court should have suppressed the evidence found in his backpack because the police officers did not have probable cause for a search warrant. "Probable cause means such a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." *State v. Naeole,* 80 Hawai'i 419, 424, 910 P.2d at 732, 737 (1996). Probable cause existed because the officers believed they saw a magazine clip to a gun in Birano's backpack, which led to a "strong suspicion of the guilt of the accused." *Id.*

---

**13.** Theft was included in the jury instructions as an included offense of robbery.

 Birano contends the police officers seized and searched his property without a warrant and obtained the warrant after they had already searched his backpack. However, the only evidence Birano brought forth was his own testimony that the officers ripped or tampered with the backpack to obtain a search warrant. In deciding whether the evidence should be suppressed, the circuit court found the testimony of the police officers more credible than Birano's testimony. "It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." *State v. Mattiello,* 90 Hawai'i 255, 259, 978 P.2d 693, 697 (1999) (internal quotation marks, citation, and brackets omitted).

> [T]he proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his own Fourth Amendment rights were violated by the search and seizure sought to be challenged. The proponent of the motion to suppress must satisfy this burden of proof by a preponderance of the evidence.

*State v. Balberdi,* 90 Hawai'i 16, 21, 975 P.2d 773, 778 (App.1999) (quoting *State v. Anderson,* 84 Hawai'i 462, 467, 935 P.2d 1007, 1012 (1997)). Birano failed to meet his burden that the "evidence sought to be excluded was unlawfully secured" and that his "Fourth Amendment rights were violated by the search and seizure." *Balberdi,* 90 Hawai'i at 21, 975 P.2d at 778.

Therefore, the circuit court did not err in denying Birano's Motion to Suppress.

### 3. The burglary conviction did not merge with robbery conviction.

 Birano contends the circuit court should have dismissed the burglary conviction because it merged with the robbery conviction. Birano claims that under HRS § 701–109(1) (1993) he should not have been convicted of both Burglary in the First Degree and Robbery in the First Degree. Hawaii Revised Statutes § 701–109 states in relevant part:

§ 701–109 **Method of prosecution when conduct establishes an element of more than one offense.** (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:

> (a) One offense is included in the other, as defined in subsection (4) of this section[.]
>
> . . . .
>
> (4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:
>
> (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]

Burglary in the First Degree occurs when a "person intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and . . . [t]he person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling." HRS § 708–810(1)(c). Robbery in the First Degree is when *"in the course of committing theft* . . . [t]he person is armed with a dangerous instrument and . . . [t]he person threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property." HRS § 708–840(1)(b)(ii) (emphasis added). Robbery does not include the element required for Burglary in the First Degree of intentionally entering or remaining unlawfully in a building. *State v. Vinge,* 81 Hawai'i 309, 320, 916 P.2d 1210, 1221 (1996). It was possible for Birano to commit Robbery in the First Degree without committing Burglary in the First Degree. *Id.* The crimes are not included in each other and do not merge.

### 4. The circuit court properly admitted evidence.

 Birano contends the circuit court allowed the prosecutor to elicit hearsay and

inadmissible evidence, thereby violating his right to a fair trial.

 Birano contends the circuit court admitted "prejudicial and inflammatory evidence" of his status as a convicted felon. "We apply two different standards of review in addressing evidentiary issues. Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." *State v. Ortiz*, 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999) (internal quotation marks and citations omitted).

Birano filed a motion in limine to exclude his prior and subsequent record of arrests and convictions and the label "convicted felon." The circuit court ruled that the only reference to Birano's specific convictions for robbery and drug offenses would be that he had prior convictions and he was a convicted felon. However, Birano stipulated for purposes of the weapons charge that he "had been convicted of offenses which constitute felony offenses in the State of Hawaii"; had "not been pardoned for these offenses"; and "was aware that as a convicted felon, he was prohibited from owning, possessing, or controlling any type of firearm or ammunition." Birano even testified before the jury that because he had a record, he was not supposed to have the SWD 11 or the ammunition. Therefore, Birano fails to point out where the circuit court erred and how he was denied a fair trial.

Birano also contends the circuit court erred by admitting evidence of the ski mask worn by Nakano and allowing "numerous instances of prejudicial hearsay" to go to the jury. These contentions are also without merit.

### D. Sentencing

 Birano contends the circuit court abused its discretion by sentencing him to two extended life terms of imprisonment with the possibility of parole, plus mandatory minimum terms of imprisonment.

Birano contends that because no property was taken, no shots were fired, no one was injured, and the jury found one continuing and uninterrupted course of conduct, the circuit court should not have sentenced him to two life terms. Birano contends the sentence was disproportionate to the offenses because his co-defendants received lesser sentences and because he had only two prior felony convictions. Birano also contends the circuit court sentenced him based on information that the judge obtained during the "ex parte" communication.

Birano's dangerous and violent behavior was made known to the circuit court by trial testimony as well as through the presentence report at sentencing. This information made Nakano's attorney's ex parte communication to the circuit court judge that Nakano was "afraid" or "very, very afraid" harmless error as to Birano's dangerous and violent behavior.

Birano committed the multiple offenses in this case while on parole for prior convictions. The circuit court had the discretion to sentence Birano to extended terms of imprisonment as a "persistent offender" under HRS § 706–662(1) (Supp.2004) or as a "multiple offender" under HRS § 706–662(4) (Supp.2004). Birano does not show how the circuit court "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Rivera*, 106 Hawai'i 146, 154–55, 102 P.3d 1044, 1052–53 (2004) (internal quotation marks and citation omitted). Birano makes no argument why he should not have been given mandatory minimum terms of imprisonment pursuant to HRS § 706–606.5 as a repeat offender. Therefore, the circuit court did not abuse its discretion in sentencing Birano to two life terms of imprisonment.

### III.

The Judgment filed on February 18, 2003 in the Circuit Court of the First Circuit is affirmed.