126 P.3d 357

**STATE of Hawai'i, Respondent–Appellee,**

v.

**Arthur BIRANO, Petitioner–Appellant.**

**No. 25699.**

Supreme Court of Hawai'i.

Jan. 11, 2006.

Jeffrey A. Hawk (of Hawk, Sing & Ignacio) for petitioner-appellant, on the writ.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ.; DUFFY, J., dissenting, with whom ACOBA, J., joins.

Opinion of the Court by MOON, C.J.

Defendant-appellant Arthur Birano timely petitioned this court for a writ of certiorari to review the Intermediate Court of Appeals' (ICA) published opinion in *State v. Birano*, No. 25699, 109 Hawai'i 327, 126 P.3d 370 (Haw.App. Sept. 28, 2005) [hereinafter, opinion]. Therein, the ICA affirmed the February 18, 2003 Judgment of the Circuit Court of the First Circuit, the Honorable Sandra A. Simms presiding, convicting Birano of the following offenses subsequent to a jury trial: (1) Robbery in the First Degree (Count I), in violation of Hawai'i Revised Statutes (HRS) § 708–840(1)(b)(ii) (1993 and Supp.2004);[1] (2) Kidnapping (Count II), in violation of HRS § 707–720(1)(e) (1993);[2] (3) Burglary

---

**1.** HRS § 708–840 provides, in relevant part, that:

(1) A person commits the offense of robbery in the first degree if, in the course of committing theft:

...;

(b) The person is armed with a dangerous instrument and: ·

...;

(ii) The person threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property.

(2) As used in this section, "dangerous instrument" means any firearm, whether loaded or not, and whether operable or not, or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or threatened to be used is capable of producing death or serious bodily injury.

(3) Robbery in the first degree is a class A felony.

**2.** Although Birano was convicted of kidnapping, the trial court dismissed the kidnapping conviction pursuant to an interrogatory on the jury verdict form, wherein the jury found that the State did not prove beyond a reasonable doubt that Birano acted with separate and distinct intents in committing robbery in the first degree (Count I) and kidnapping (Count II); thus, Count II merged into Count I.

in the First Degree (Count III), in violation of HRS § 708–810(1)(c) (1993);[3] (4) Possession of a Prohibited Firearm (Counts IV and V), in violation of HRS § 134–8(a) (1993);[4] (5) Ownership or Possession of any Firearm or Ammunition by a Person Convicted of Certain Crimes (Counts VI and VII), in violation of HRS § 134–7(b) and (h) (Supp.2004);[5] and (6) Carrying, Using, or Threatening to Use a Firearm in the Commission of a Separate Felony (Count VIII), in violation of HRS § 134–6(a) and (e) (Supp.2004).[6] The trial court sentenced Birano to: (1) an extended term of life imprisonment with the possibility of parole, with a mandatory minimum sentence of fifteen years for use of a semi-automatic weapon and six years and eight months as a repeat offender for Count I; (2) an extended term of twenty years of imprisonment for use of a semi-automatic weapon and three years and four months as a repeat offender for Count III; (3) an extended term of ten years of imprisonment, with a mandatory minimum of one year and eight months as a repeat offender for Counts IV and VI; (4) an extended term of twenty years of imprisonment, with a mandatory minimum of

3. HRS § 708–810 provides in relevant part that:

(1) A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and:
 . . .;
(c) The person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.
 . . . .
(3) Burglary in the first degree is a class B felony.

4. HRS § 134–8 provides in relevant part that:

(a) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of any of the following is prohibited: assault pistols, except as provided by section 134–4(e); automatic firearms; rifles with barrel lengths less than sixteen inches; shotguns with barrel lengths less than eighteen inches; cannons; mufflers, silencers, or devices for deadening or muffling the sound of discharged firearms; hand grenades, dynamite, blasting caps, bombs, or bombshells, or other explosives; or any type of ammunition or any projectile component thereof coated with teflon or any other similar coating designed primarily to enhance its capability to penetrate metal or pierce protective armor; and any type of ammunition or any projectile component thereof designed or intended to explode or segment upon impact with its target.
 . . . .
(d) Any person violating subsection (a) or (b) shall be guilty of a class C felony and shall be imprisoned for a term of five years without probation.

5. HRS § 134–7 states in relevant part that:

(b) No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.

 . . . .
(h) Any person violating subsection (a) or (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony.

6. HRS § 134–6 provides in relevant part that:

(a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not; provided that a person shall not be prosecuted under this subsection where the separate felony is:
(1) A felony offense otherwise defined by this chapter;
(2) The felony offense of reckless endangering in the first degree under section 707–713;
(3) The felony offense of terroristic threatening in the first degree under section 707–716(1)(a), 707–716(1)(b), and 707–716(1)(d); or
(4) The felony offenses of criminal property damage in the first degree under section 708–820 and criminal property damage in the second degree under section 708–821 and the firearm is the instrument or means by which the property damage is caused.
 . . . .
(e) Any person violating subsection (a) or (b) shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony.

A conviction and sentence under subsection (a) or (b) shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under subsection (a) or (b) may run concurrently or consecutively with the sentence for the separate felony.
(Internal brackets omitted.)

three years and four months as a repeat offender for Counts V and VII; and (5) an extended term of life imprisonment with the possibility of parole, with a mandatory minimum sentence of six years and eight months as a repeat offender for Count VIII.

In his petition, Birano contends that the ICA gravely erred in affirming his convictions, discussed in more detail, *infra.* We granted certiorari on November 3, 2005, solely to address whether Birano's constitutional rights to an impartial judge and to cross-examine his witnesses were violated as a result of an *ex parte* communication between the trial judge, the prosecutor, and a co-defendant/witness.[7]

## I. *BACKGROUND*

We adopt the unchallenged factual background as set forth in the ICA's opinion. Briefly stated, the charges against Birano arose out of an incident that occurred on May 16, 2001 when he pointed a gun at Frederick Dumlao and demanded money from him and, thereafter, when the police seized Birano's backpack in the course of his capture later the same day.[8] Also, at trial, all of the witnesses testified to substantially similar events but differed as to Birano's intent.

Prior to trial on September 4, 2002, Birano filed a Motion to Suppress Evidence (motion to suppress), claiming that "the police seized and searched [his] property without a warrant." The trial court denied the motion to suppress at a hearing on September 10, 2002.

Jury selection began on September 11, 2002, followed by trial. During trial, Birano moved for a mistrial on the ground that one of the jurors: (1) admitted during selection that he was "predisposed" to accepting the testimony of police officers as true; (2) recognized one of the police witnesses during trial; and (3) checked the officers' teaching records as an instructor in the Criminal Justice Program at Chaminade University, where the juror was the dean of the graduate school. Opinion at 109 Hawai'i at 332–33,

126 P.3d at 375–76. The trial judge denied Birano's motion, finding that the juror's ability to be fair and impartial was not affected. Opinion at 332–33, 126 P.3d 375–76.

### 1. The confrontation

On September 18, 2002, the prosecution called Nakano (co-defendant, *see supra* note 8) as a witness to testify as to his version of the events that occurred on May 16, 2001. At that time, Nakano

> invoked his Fifth Amendment right to remain silent. The prosecutor requested a bench conference and informed the [trial] judge that the prosecutor had met with Nakano "this morning, and it went fine. He was supposed to testify. And I don't know." The [trial] judge recessed and had Nakano's attorney called to come immediately to court. After the [trial] judge held a meeting in chambers with the prosecutor, Nakano, and Nakano's attorney, Nakano decided to testify. Birano's attorney objected to not being allowed to attend the meeting in chambers and asked for a mistrial, claiming that an ex parte communication had occurred with the judge because the prosecutor was allowed to attend the meeting while Birano and his attorney were excluded. The [trial] court denied Birano's request for a mistrial, finding that the meeting was not an ex parte communication because Nakano was a defendant in the case and was represented by counsel. The [trial] court granted the State's oral motion in limine to exclude questioning of Nakano by Birano's counsel about Nakano's reasons for pleading the Fifth Amendment and then changing his mind. Birano's counsel objected.

Opinion at 333, 126 P.3d at 376. Nakano related the following events during his subsequent testimony:

> [O]n May 16, 2001[,] he met Takara [(other co-defendant, *see supra,* note 8)] at Makiki Village and told Takara he wanted to smoke dope. Birano was also there, and

---

7. We review briefly Birano's remaining contentions in Section III.B., *infra.*

8. Birano's two co-defendants in this case, Nicolas Nakano and Bryce Takara, both pled no contest to their charges.

Nakano walked over and introduced himself to Birano; Nakano had never met Birano before. It was Takara's idea to go to Dumlao's residence to get the dope. Birano, Takara, and Nakano discussed that they were going to "take dope" from Dumlao.

Birano, Takara, and Nakano got in Birano's Camaro, drove down Kewalo Street to Dumlao's apartment building, turned into the parking lot, and parked behind Dumlao's car. Dumlao and his girlfriend were getting out of their car with a laundry basket. Nakano testified that Birano got out of the car, walked over to Dumlao, and put a black "machine gun" to Dumlao's head. Nakano identified State's Exhibit 18 as the black "machine gun" Birano was holding. State's Exhibit 18, a S.W.D. [Model] 11 semiautomatic firearm (the SWD 11) was received in evidence. Nakano testified he "panicked" when he saw Birano point the SWD 11 at Dumlao's head and Dumlao's girlfriend ran away when Birano pointed the SWD 11 at Dumlao's head.

Nakano testified that when he approached Dumlao he was wearing a face mask that Takara had given him in the car. Birano told Dumlao to take him to Dumlao's safe. Dumlao took the three men up the stairs to the third floor to his apartment. Dumlao's neighbor opened the door and asked if everything was all right, and Nakano told her "yeah." When they reached Dumlao's apartment, Dumlao tried to walk away, but Birano made Dumlao come back and told him to open the door or he would shoot Dumlao. Dumlao unlocked the door and ran into the apartment. Birano, still holding the SWD 11, entered behind Dumlao, then Takara, and lastly Nakano. Nakano did not see Dumlao after Dumlao entered the apartment. When Nakano entered the apartment, he was carrying the mask; he put the mask on and then took it off. Nakano testified that Birano told him to search the house, and the three of them searched, but they did not find anything of value to take. Birano, Takara, and Nakano went back to the Camaro and drove way because they thought Dumlao would call the police. Na-

kano testified that Birano told him that he was going to "shoot us out of it" if the police came. Nakano admitted he was "high" on crystal methamphetamine during the incident.

Opinion 333–34, 126 P.3d 376–77.

On September 25, 2002, the prosecution called complaining witness Frederick Dumlao as a witness. He testified that:

[O]n May 16, 2001, he was unloading laundry from his car in the parking lot of his apartment building with his girlfriend, Cari–Ann Casil (Casil), and his friend Brian, when a red Camaro pulled up behind and blocked in Dumlao's car. Birano got out of the Camaro and walked up to Dumlao. Birano had an "uzi" and was accompanied by two males (Nakano and Bryce Takara (Takara)), one of whom was wearing a ski mask. Birano told Dumlao to take him up to Dumlao's apartment and open Dumlao's safe. Dumlao testified he was scared because Birano had a gun pointed at him, so he did what Birano told him to do. Dumlao's neighbor came out to see if everything was all right, and Dumlao said he was "all right" because he did not want to get his neighbors involved. When Dumlao entered his apartment, he noticed the glass door to the balcony was open so he ran out to the balcony, climbed over to his neighbor's balcony, and slid down to the first floor. Dumlao ran to the street and called the police. Dumlao testified that prior to May 16, 2001, he did not know Birano, Nakano, or Takara.

Opinion at 332–33, 126 P.3d at 375–76. On cross-examination, defense counsel questioned Dumlao's version of events as contrary to Birano's version, quoted *infra*. However,

Dumlao denied that on May 15, 2001[,] at the Makiki Market Village, Birano had given him $2,500.00 for drugs and he was supposed to return with the drugs and failed to do so. Dumlao also denied that, in the parking lot on May 16, Birano demanded his money back and Dumlao told Birano that Dumlao had the money. Dum-

lao admitted that the videotape[9] played to the jury showed Dumlao swinging his arms back and forth and walking very casually past his neighbors' apartment, but Dumlao testified he felt threatened the entire time. Dumlao testified that on May 16, 2001, he did not recognize Birano even though, prior to May 16, he had once been introduced to Birano by his friend, Joseph Poomaihealani (Joseph). Dumlao denied that in a telephone conversation with Joseph several days after May 16 he had admitted it was his fault for everything that happened on May 16 with Birano. Dumlao also denied that any drug transaction with Birano happened on May 15, 2001.

Opinion at 333, 126 P.3d at 376. The following day, on September 19, 2002, Casil, Dumlao's girlfriend, testified that:

[W]hen she saw Birano point the SWD 11 at Dumlao, she ran screaming towards her upstairs apartment. She did not go to her apartment, but jumped off the second floor railing and went to a neighbor's apartment where she called the police and told the police she thought her boyfriend had been shot. She testified she was scared when she saw the SWD 11 pointed at Dumlao.

Opinion at 334, 126 P.3d at 377. Dumlao's neighbors Rei Kobayashi and her boyfriend, Ruben Cruz, also testified on September 19, 2002 as follows:

Kobayashi testified she woke up "to a woman screaming" and "heard ... banging noises." Cruz testified he heard people walk by their apartment and stop at Dumlao's apartment and then he heard voices getting louder and louder. Cruz and Kobayashi both testified that they opened their door and saw Dumlao surrounded by three males. Kobayashi testified she asked Dumlao if everything was okay and Dumlao answered "yes." Cruz testified that Dumlao looked worried, but Cruz did not see a gun.

Opinion at 334, 126 P.3d at 377. On September 26, 2002, Birano took the stand and admitted he had the SWD 11 when he confronted Dumlao and that he was not supposed to carry a gun. Opinion at 334, 126 P.3d at 377. However, he testified that:

[O]n May 14[,] he had given Dumlao money for drugs, but Dumlao never returned with the drugs. Birano stated that he was mad and just wanted his money back from Dumlao and he went to Dumlao's apartment on May 16 to get back his money. Birano testified that when he got out of the car at Dumlao's, he had the SWD 11 out, but not pointed at Dumlao, and was yelling at Dumlao that he wanted his money from Dumlao. Birano testified that Dumlao said "the thing stay upstairs." Birano put the SWD 11 in his pants when he saw that Dumlao did not have a gun. Birano went upstairs with Dumlao because he assumed Dumlao had his cash and he was going to get it back. Birano testified he did not tell Dumlao to open Dumlao's front door or threaten Dumlao to get him to open the door, he was not trying to kidnap or terrorize Dumlao, and he did not threaten to shoot Dumlao. When Dumlao stepped back after opening the door, Birano pulled out the SWD 11 and told Dumlao not to play games. Birano testified that after Dumlao jumped off the balcony, he did not search or take anything from the apartment even though he had a chance to do so. Birano stated that Takara and Nakano searched and made the mess in Dumlao's apartment and he did not stop them.

Opinion at 332–36, 126 P.3d at 375–79. Birano's witness Joseph Poomaihealani, testified that:

Birano was a childhood friend of his. Joseph was also a friend of Dumlao and had introduced Dumlao to Birano in 2000. Joseph testified he called Dumlao one or two days after the May 16, 2001 incident and Dumlao said he and Birano were going to do a drug transaction, he had taken Birano's money, and what had happened on May 16 had been his fault.

Opinion at 335, 126 P.3d at 378.

## 2. Seizure and search of Birano's property

On September 19, 2002, the prosecution called as witnesses the police officers in-

---

9. Dumlao gave the police a surveillance videotape recorded by a security camera he installed by his kitchen window after a break in a month prior to the confrontation with Birano. The videotape showed Dumlao and the three defendants in the hallway and entering the apartment.

volved in the seizure of Birano's backpack and the subsequent search of its contents. They testified to the following events:

Police Officer Vargas (Vargas) testified that on May 16, 2001, he was a member of the Specialized Services Division (SWAT team) and had been assigned to locate and arrest Birano on a parole retake warrant. While Vargas, Sergeant De Mello (De Mello), and Officer Kiho (Kiho) were checking places where Birano usually hung out, they received a radio call that Birano was possibly at his parents' house. Vargas testified that as they drove past the entrance/exit of Birano's parents' house, he noticed a black vehicle moving slowly towards School Street. The officers were dressed in their SWAT gear with the word "Police" on the front and back of their vests. Vargas testified they parked their vehicle right past the entrance/exit and he and De Mello proceeded on foot towards the black vehicle. Vargas testified he drew his weapon because he had information that Birano was armed and dangerous and word "on the street" was that "Birano said he wasn't going to be taken alive and he was going to shoot it out with the police."

Vargas testified that as he approached the black vehicle, he said, "Police, stop, and get out of the vehicle." The driver of the vehicle obeyed, but Birano came out of the driver's side back door, made eye contact with Vargas, and then ran, clutching a black bag (backpack), towards a canal at the back of the parking lot. Vargas and De Mello chased after Birano. Birano jumped over a chain link fence, fell onto the embankment, and then fell about twenty feet into the canal. Birano got up and ran up the canal. Vargas testified that he saw the backpack on the embankment, so he stayed with the backpack while De Mello got into the canal and chased Birano. Vargas noticed a tear in the backpack and a pistol-type magazine sticking out of the tear. Based on his training and experience, Vargas believed there was a gun inside the backpack. Vargas handed the backpack over to Detective Hamasaki (Hamasaki). Vargas identified State's Exhibit 32 as the backpack he recovered; State's Exhibit 32 was moved into evidence. Var-

gas testified that from the time he had the backpack in his custody until he gave it to Hamasaki, he did not tamper with or tear the backpack in any way.

Hamasaki testified he received the backpack from Vargas and noticed a firearm magazine sticking out from a hole in the backpack. Hamasaki took the backpack to the police station and prepared the search warrant, which was signed by the on-duty judge. Hamasaki testified that Police Officer Sellers (Sellers) executed the search warrant on the backpack. Hamasaki testified that while the backpack was in his custody he did not open or tear the backpack nor tamper with any of the evidence in any way.

Sellers testified that on May 16, 2001, he retrieved the backpack from an evidence locker and noticed "a long extended magazine protruding out of the front portion of the backpack" from a "cut-open space just above the middle portion of the middle zipper" of the backpack. Sellers and Officer Maluenda removed a "Mac 11 sole weapon" (the SWD 11) from the backpack and then removed the magazine from the SWD 11 and a nine millimeter round from the chamber of the SWD 11. Sellers testified that from the time he took custody of the backpack until he turned it over to the evidence technician neither he nor Officer Maluenda ripped or tore the backpack or tampered with any of the evidence in any way.

Kubo testified that he was a criminalist for the HPD crime lab and worked in the Firearms Unit of the Scientific Investigation Division. The [trial] court qualified Kubo as an expert in the field of firearms and ballistics. Kubo testified that on May 18, 2001 he test-fired the SWD 11 and found the SWD 11 to be in operating condition.

During trial, the parties stipulated, among other things, that (1) on May 16, 2001, Birano was the owner of the black "Eastpak" backpack recovered by the police on the same date; (2) evidence from the execution of the search warrant on the backpack consisted of sunglasses, a dark blue ski mask, the SWD 11, a plastic maga-

zine that fit into the SWD 11, thirty cartridges headstamped "WIN 9mm LUGER" that were recovered from the plastic magazine of the SDW 11, and one cartridge removed from the chamber of the SWD 11 headstamped "WIN 9mm LUGER"; and (3) Birano had prior felony convictions that prohibited him from owning, possessing, or controlling any type of firearm or ammunition.

Opinion at 334–35, 126 P.3d at 377–78.

On September 27, 2002, the jury returned its verdict, finding Birano guilty as charged in all counts. Judgment was entered on February 18, 2003. Birano timely appealed on March 17, 2003. Hawai'i Rules of Appellate Procedure (HRAP) 4(b)(1).

## II. STANDARD OF REVIEW

The acceptance or rejection of an application for a writ of certiorari is discretionary. HRS § 602–59(a) (1993). In making such a determination, this court reviews the ICA's decision for either "grave errors of law or fact," or "obvious inconsistencies in the decision of the [ICA] with the supreme court, federal decisions, or its own decision, and the magnitude of such errors or inconsistencies dictating the need for further appeal." HRS § 602–59(b) (1993).

## III. DISCUSSION

### A. The Ex Parte Communication

Birano contends that the ICA gravely erred in holding that the *ex parte* communication between the trial judge, prosecutor, Nakano, and Nakano's counsel did not violate his right to a fair trial. Essentially, Birano posits that the *ex parte* communication that occurred in chambers improperly biased the trial judge. Additionally, Birano maintains that he was denied an opportunity to attack Nakano's credibility as a result of the trial court (1) excluding him or his attorney from participating in the in-chambers meeting and (2) denying a hearing on the substance of the discussions at the meeting.

We agree with the ICA that the trial judge improperly participated in an *ex parte* communication, in violation of Canons 2(A) [10] and 3(B)(7) [11] of the Revised Code of Judicial Conduct, thereby raising a question of the fairness of Birano's trial. Opinion at 337, 126 P.3d at 380. The ICA reasoned that:

Nothing in the record demonstrates that the meeting induced Nakano to testify against Birano or any kind of deal was struck (which was Birano's concern). The [trial] court was not aware of Nakano's decision to testify at the time Birano requested a mistrial:

THE COURT: . . . During the time that the Court met with counsel and with [the prosecutor] and [Nakano's] counsel, I was not informed whether or not Mr. Nakano was going to be testifying or not. I don't know at this point.

. . . .

THE COURT: . . . If there's any question about any deals, that was not part of the discussion.

The [trial] court disclosed to Birano what had occurred in chambers. Birano has not challenged the representations made by the [trial] judge. Nakano's testimony as to the events of May 16, 2001, was substantially consistent with Birano's testimony. Birano himself testified that he confronted Dumlao with a loaded gun.

*In the instant case, there is "convincing evidence that the jury's deliberations, as a whole, were not biased by the undisclosed communication," making the ex parte communication harmless error. Rushen [v. Spain], 464 U.S. [114,] 121, 104 S.Ct.*

---

**10.** Canon 2(A) of the Code of Judicial Conduct states that "[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

**11.** Canon 3(B)(7) states that:
A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law.

A judge shall not initiate, permit, or consider *ex parte* communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding[.]
Although there are exceptions to this canon, the parties and the court agreed that the communication did not fall into any applicable exception.

453, 78 L.Ed.2d 267 [ (1983) ]. The [trial judge's actions in allowing this ex parte communication were not "so egregious and fundamentally unfair as to deprive the defendant of his constitutional rights." *LaChappelle [v. Moran]*, 699 F.2d [560,] 566 [ (1st Cir.1983) ]. Based on the totality of the evidence presented, there is no reasonable possibility that the error complained of contributed to the conviction. *[State v.] Pauline*, 100 Hawai'i [356,] 378, 60 P.3d [306,] 328 [ (2002) ]. Therefore, the communication did not erode Birano's ability to have a fair trial. *LaChappelle*, 699 F.2d at 567.

Opinion at 337–39, 126 P.3d at 380–82 (emphasis added).

Although we do not believe the ICA committed any "grave errors of law or fact," HRS § 602–59(a), we agree with Birano that the ICA erred to the extent that it focused improperly on jury impartiality and failed to characterize Birano's particular rights affected by the *ex parte* communication. In that regard, the ICA's analysis is inconsistent with this court's decisions as it relates to Birano's rights to an impartial judge, to be present at every stage of trial, and to confront an adverse witness with impeachment evidence. Defense counsel clarified to the trial court that:

> The point is that I don't know what happened in that room. . . . I don't know if there was any kind of deal struck. I don't know what changed [Nakano's] mind . . . And I have to point out that this witness, [Nakano], has pleaded no contest as charged to, I believe, not only this case but in another case that he's also been charged with without any kind of deal from the Prosecution and still faces sentencing from this Court. With that set of factors, how can the Defense here for [Birano] not feel that something is amiss.

Therefore, in order to determine the prejudicial effect of the error complained of, if any, we examine the specific rights Birano claims were violated.

### 1. Impartiality of the judge

 This court has said that:

> [W]here judicial misconduct or bias deprives a party of the impartiality to which he or she is entitled, a new trial may be required. However, reversal on the grounds of judicial bias or misconduct is warranted only upon a showing that the trial was unfair. Unfairness, in turn, requires a clear and precise demonstration of prejudice.

*State v. Hauge*, 103 Hawai'i 38, 48, 79 P.3d 131, 141 (2003) (brackets in original) (citations and quotation marks omitted). When trial resumed after Nakano's refusal to testify, the trial judge informed the parties, outside the presence of the jury, that:

> [T]he court met in chambers with [the prosecutor] and with [Nakano's counsel] who spoke with his client and indicated that, you know, *he was afraid, which I think is clear. He's very very afraid.* And so after that, he met with him again. And this is where we are now.

Birano essentially contends that the trial judge's knowledge that Nakano was "afraid" improperly biased the judge; however, he does not demonstrate how the alleged bias prejudiced his right to a fair trial. The trial judge stated that it was "clear" that Nakano was "very very afraid" and this information was not shared in front of the jury. Nothing in the record indicates that the judge made improper remarks or engaged in any improprieties during the trial. Thus, we agree with the ICA that, in this respect, the *ex parte* communication did not unfairly prejudice Birano's right to a fair trial.

### 2. Right to be present at every stage of trial

 Birano also contends that:

> By engaging in the ex parte communication, by failing to keep a transcribed record of what transpired during the meeting and by precluding the defense from cross examining the witness on the obvious bias implied by his sudden change of mind after the ex parte communication, the court deprived the defense of a crucial credibility attack against the bias, interest or motive of one of the State's primary witnesses. . . . Moreover, the ICA failed to recognize that any claimed inability to

demonstrate the requisite prejudice was due to the [trial] court's rulings and not based on any lack of effort by the defense.

Under Hawai'i law,

> there is a generalized right to be present at "every stage of trial" by the defendant, pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 43(a). We have generally stated that it has long been recognized in the American criminal justice system that a defendant has a right to be present at all stages of his trial.... However, as with other procedural safeguards, a violation of a defendant's right of presence is subject to harmless error analysis, unless the deprivation, by its very nature, cannot be harmless. Under this standard, this court must determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction.

*Pauline,* 100 Hawai'i at 378, 60 P.3d at 328 (citations, brackets, and quotation marks omitted). This same standard is applied to a violation of a defendant's Sixth Amendment right to confront an adverse witness. *State v. Balisbisana,* 83 Hawai'i 109, 113–14, 924 P.2d 1215, 1219–20 (1996) ("Violation of the constitutional right to confront adverse witnesses is subject to the harmless beyond a reasonable doubt standard.... In applying the harmless beyond a reasonable doubt standard[,] the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." (Citations and quotation marks omitted.)). "If there is such a reasonable possibility in a criminal case, then the [*ex parte* communication] is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside." *State v. Gano,* 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999) (internal quotation marks and citation omitted).

▮ In *Balisbisana,* this court stated that the scope of cross-examination

> is generally within the sound discretion of the trial court. While the right of cross-examination protected by the Confrontation Clause of the Sixth Amendment may

not be duly restricted, it has never been held that this right is absolutely without restriction. However, the trial court's discretion in exercising control and excluding evidence of a witness's bias or motive to testify falsely becomes operative only after the constitutionally required threshold level of inquiry has been afforded the defendant. *The Sixth Amendment is satisfied where sufficient information is elicited to allow the jury to gauge adequately a witness' credibility and to assess his [or her] motives or possible bias. When the trial court excludes evidence tending to impeach a witness, it has not abused its discretion as long as the jury has in its possession sufficient information to appraise the biases and motivations of the witness.*

83 Hawai'i at 114, 924 P.2d at 1220 (citations, quotation marks, and ellipses points omitted) (brackets in original) (emphasis added). Where an abuse of discretion is found,

> [t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of a witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* at 117, 924 P.2d at 1223 (citations omitted). In *Balisbisana,* this court held that, "[a]s the prosecution's case rested solely on [the complaining witness'] testimony, her credibility was crucial," and, therefore, the trial court's abuse of discretion in limiting her cross-examination was not harmless beyond a reasonable doubt. *Id.* Balisbisana was convicted of abuse of a family or household member for harassing and assaulting the complaining witness. *Id.* at 111, 924 P.2d at 1217. In that case, this court held that

the trial court abused its discretion where it prohibited all inquiry into the complaining witness' conviction for abuse of a household member from which the jury could have inferred that the witness had a motive to bring false charges against the defendant and give false testimony at trial. *Id.* at 116, 924 P.2d at 1222.

By contrast, the trial court in the instant case did not prohibit all inquiry into Nakano's motive to testify. During cross-examination, defense counsel questioned Nakano as follows:

Q. Let me ask you this.

You're young; you're in trouble; and you pleaded no contest; right?

A. Yeah.

Q. You want to do well in front of the Prosecution, in front of your attorney, in front of the judge, right?

A. No, not necessarily.

Q. You're facing—By the way, you pleaded No Contest to your charges?

A. Yes.

Q. You didn't plead guilty, right?

A. No.

Q. You just didn't want to contest things so you could get off easier; right?

[Prosecution]: Objection. That's not what the witness—

[Nakano]: Not necessarily.

THE COURT: Well, he can certainly pose the question.

Q. You pleaded—You pleaded no contest; right?

A. Yeah.

Q. You didn't contest the government's evidence against you, but you didn't plead guilty; right?

A. Yeah.

Q. And you're facing—And you are facing, by the way—And you pleaded without any kind of deal from the Prosecution; right?

A. Yes.

Q. You're hoping that by testifying favorably for the State against my client to make him look bad that perhaps the judge will be lenient with you at sentencing; right?

A. No.

. . . .

Q. In fact . . . you could be getting life, plus 20. You understand that?

A. Yes.

Q. By your testimony today, isn't it true that you're going to ask for Youthful Offender sentencing at your sentencing, in a very short while, where you can get a maximum of eight years total?

A. I was asking for that before my testimony.

Q. But that's what you're hoping for; right?

A. But now I'm pleading No contest.

Q. That's what you're hoping for; right?

A. Yes.

Even assuming, *arguendo*, that the trial court abused its discretion in prohibiting inquiry into the specific reasons why Nakano changed his mind, the error was harmless.

The "damaging potential" of evidence regarding Nakano's reason for changing his mind about testifying was that the jury would disbelieve Nakano's account of the incident and believe, instead, that Nakano had offered false testimony in the hopes of receiving a lighter sentence. Unlike the situation in *Balisbisana*, Birano would not have likely been acquitted, even if the potential to cross-examine Nakano had been fully realized. Nakano was not the only witness to the event, and the conviction did not rest on his credibility alone. The only material difference between Birano's testimony and the testimony of the other witnesses was Birano's position that his intent in going to Dumlao's apartment was to get back Birano's $2,500, rather than "tak[ing] dope" from Dumlao. However, this difference is immaterial because, as the ICA correctly held, the "claim of right" defense does not apply to robbery charges where a defendant uses force to try to reclaim his property. Furthermore, with regard to the charges for illegally possessing firearms, Nakano's testimony is cumulative because Birano admitted to possessing the gun, other witnesses testified to seeing Bira-

no holding it, and the police found the gun in his backpack.

In light of the foregoing analysis and based on a careful review of the record, we agree with the ICA, albeit on different grounds, *see State v. Gomes,* 107 Hawai'i 308, 113 P.3d 184 (2005) (holding that the ICA erred in reaching the merits of defendant's claim but nevertheless affirming on different grounds), that the trial court's preclusion of Birano's questioning of Nakano regarding Nakano's motives for changing his mind about testifying was harmless error.

## B. *Birano's Remaining Contentions*

■ First, Birano contends that the ICA erred by ruling that this court's holding in *State v. McMillen,* 83 Hawai'i 264, 265, 925 P.2d 1088 (1996), "absolutely precludes the 'claim of right' defense to a robbery charge" and that the absence of an instruction on such defense at trial rendered the jury instructions prejudicially insufficient or erroneous. We disagree.

In *McMillen,* the trial court also did not provide an instruction on 'claim of right' to a robbery charge, and this court held that the absence of the instruction was proper because the legislature had expressed a "policy of discouraging self help through force," thereby precluding the application of a claim of right defense to a robbery charge. *Id.* at 267, 925 P.2d at 1091. Accordingly, Birano's contention lacks merit.

■ Second, Birano essentially repeats his argument made to the ICA that the trial court abused its discretion in imposing extended terms of imprisonment as well as mandatory sentencing where it failed to consider "numerous mitigating factors." The sentencing judge has broad discretion in imposing sentences. *State v. De Guair,* 108 Hawai'i 179, 187, 118 P.3d 662, 669 (2005). Under HRS § 706–662 (Supp.2004), the trial court is permitted to impose an extended sentence for "persistent" and/or "multiple" offenders. In light of Birano's prior convictions, the ICA was correct in concluding that the trial court did not abuse its discretion during sentencing.

Birano also reiterates his arguments made on appeal to the ICA that several alleged errors by the trial court essentially violated his right to a fair trial, to wit: the trial court's (1) refusal to dismiss a juror for cause, (2) refusing to suppress evidence seized through an allegedly illegal search, (3) refusal to dismiss the burglary conviction as having merged into the robbery conviction, and (4) allowing the prosecution to elicit allegedly prejudicial and inadmissible testimony. Inasmuch as the ICA: (1) properly deferred to the trial court's finding that the juror at issue was impartial and correctly determined that no manifest prejudice resulted from the trial court's action, *State v. Graham,* 70 Haw. 627, 634, 780 P.2d 1103, 1107 (1989); (2) upheld the trial court's refusal to suppress evidence found in Birano's backpack based on its determination that the finding of probable cause rested on the credibility of the police officers, *State v. Mattiello,* 90 Hawai'i 255, 259, 978 P.2d 693, 697 (1999); (3) correctly held that the burglary conviction did not merge with the robbery conviction because burglary involves a separate element of intentionally entering or remaining unlawfully in a building and, therefore, cannot merge with robbery under *State v. Vinge,* 81 Hawai'i 309, 320, 916 P.2d 1210, 1222 (1996); and (4) did not err in holding that the trial court properly permitted the prosecution to (a) refer to Birano as a "convicted felon" as Birano stipulated to such convictions and (b) elicit allegedly "prejudicial" hearsay by witnesses where the only testimony that qualified as "hearsay" under Hawai'i Rules of Evidence Rule 803 was stricken by the trial court, we hold that Birano fails to demonstrate how the ICA gravely erred in concluding that his right to a fair trial was not prejudiced.

## IV. *CONCLUSION*

Based on the foregoing, we affirm the February 18, 2003 judgment of conviction and sentence.

Dissenting Opinion by DUFFY, J. in which ACOBA, J., joins.

I respectfully dissent. While the majority agrees that the *ex parte* communication

meeting between the trial judge, the prosecutor, co-defendant Nakano, and Nakano's counsel was improper, and violated Canons 2(A) and 3(B)(7) of the Revised Code of Judicial Conduct, it concludes that the improper conduct was harmless beyond a reasonable doubt. I disagree. The improper *ex parte* communication meeting occurred immediately after the prosecution called Nakano as a witness, and Nakano invoked his Fifth Amendment right to remain silent. The trial judge called a recess, and held a meeting in chambers with the prosecutor, Nakano, and Nakano's counsel. Defendant Birano and his counsel were excluded from this meeting and no contemporaneous record of what happened in this meeting was made. Following this improper meeting, Nakano recanted his prior invocation of his Fifth Amendment right to remain silent, and testified against Birano. I respectfully submit that a reasonable person using common sense would conclude that something happened in the improper *ex parte* communication meeting which caused Nakano to change his mind about testifying against Birano, and that, if a mistrial was not ordered, basic fairness would require that Birano be allowed to cross-examine Nakano regarding what happened at the improper meeting. In any event, the trial judge compounded its *ex parte* communication error by (1) denying Birano's motion for a mistrial based upon the improper meeting, and (2) granting the prosecutor's motion in limine to prevent Birano's counsel from cross-examining Nakano about the meeting and his reasons for changing his mind about testifying against Birano. We are thus left with the following challenges to Birano's right to a fair and impartial trial: (1) an improper *ex parte* communication between the trial judge, the prosecutor, co-defendant Nakano, and Nakano's counsel in a meeting held in the trial judge's chambers during trial, a meeting in which defendant Birano and his counsel were excluded, in violation of Canons 2(A) and 3(B)(7) of the Revised Code of Judicial Conduct; (2) a violation of Birano's right to be present at "every stage of the trial," in violation of Hawai'i Rules of Penal Procedure Rule 43(a); and (3) a violation of the Confrontation Clause of the Sixth Amendment when Birano's counsel was prohibited from cross-examining Nakano about the improper meeting and Nakano's reasons for changing his mind about testifying against Birano. Based upon this record, I am unable to conclude that the errors which began with the trial judge's improper *ex parte* communication meeting and cascaded thereafter are harmless beyond a reasonable doubt.