170 P.3d 861

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Michael MARS, Defendant–Appellant.**

**No. 27977.**

Intermediate Court of Appeals of Hawai'i.

Aug. 16, 2007.

James S. Tabe, Deputy Public Defender, on the briefs, for Defendant–Appellant.

James M. Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

RECKTENWALD, C.J., WATANABE and NAKAMURA, JJ.

Opinion of the Court by RECKTENWALD, C.J.

Defendant–Appellant Michael Mars (Mars) appeals from the May 17, 2006 Judgment of

Conviction and Sentence (Judgment) convicting him of three counts of Sexual Assault in the First Degree, in violation of Hawaii Revised Statutes (HRS) § 707-730(1)(c).[1]

Mars was charged with one count of Sexual Assault in the Third Degree (Count 1) in violation of HRS § 707-732(1)(c),[2] thirteen counts of Sexual Assault in the First Degree (Counts 2-14) in violation of HRS § 707-730(1)(c), and one count of Sexual Assault in the First Degree (Count 15) in violation of HRS § 707-730(1)(b).[3] Counts 1-11 related to four separate occasions in which Mars allegedly sexually assaulted a minor (Minor 1) during the period from "[o]n or about the 1st day of April, 2004, to and including the 15th day of August, 2004[.]" Counts 12-14 related to an incident in which Mars allegedly sexually assaulted Minor 1 "[o]n or about the 14th day of August, 2004, to and including the 15th day of August, 2004[.]" Count 15 related to an incident in which Mars allegedly sexually assaulted another minor (Minor 2) "[o]n or about the 6th day of August, 2004[.]"

A jury found Mars not guilty on Counts 1 through 11 and 15, but found him guilty as to Counts 12, 13, and 14. The Circuit Court of the First Circuit (circuit court) sentenced Mars to twenty years of incarceration for each of Counts 12 to 14, to be served concurrently with each other and any other sentence being served.

On appeal, Mars claims that the circuit court erred when (1) it did not permit Mars to introduce extrinsic evidence to impeach Minor 1's credibility regarding a statement Minor 1 made to his treating doctor, (2) it allowed the doctor to testify in a manner which improperly bolstered Minor 1's credibility, and (3) it allowed testimony regarding Mars's "inappropriate comments" and two incidents involving Mars and Minor 1 that were unrelated to the charges. Mars also alleges that the prosecutor committed prosecutorial misconduct by making improper inflammatory comments during closing argument.

We affirm.

## I. BACKGROUND

A mother (Mother) and her three sons,[4] Minor 1, Minor 2, and Minor 3 (collectively, the Family) came to Hawai'i in November 2003. The Family lived at the Makaha Surfside, first with Mother's mother (Grandmother), then in a separate one bedroom apartment. The Family was evicted from the Makaha Surfside at the end of March 2004 "for the boys not following house rules."

Mars, a volunteer at the local food bank, knew Grandmother because he occasionally helped her carry her food bank distributions to her car. During a visit to the food bank, Mother was introduced to Mars, whose mother (Ms. Mars) lived with Mars in a six bedroom house. Mother eventually met Ms. Mars, who offered to rent two rooms in her house to the Family. The Family moved into

1. The Honorable Dexter D. Del Rosario presided.

2. Hawaii Revised Statutes (HRS) § 707-732(1)(c) (Supp.2006) states in relevant part:

> **Sexual assault in the third degree.** (1) A person commits the offense of sexual assault in the third degree if:
>
> ....
>
> (c) The person knowingly engages in sexual contact with a person who is at least fourteen years old but less than sixteen years old or causes the minor to have sexual contact with the person; provided that:
>
> (i) The person is not less than five years older than the minor; and
>
> (ii) The person is not legally married to the minor....

3. HRS § 707-730(1) (Supp.2004) states in relevant part:

> **Sexual assault in the first degree.** (1) A person commits the offense of sexual assault in the first degree if:
>
> ....
>
> (b) The person knowingly engages in sexual penetration with another person who is less than fourteen years old; or
>
> (c) The person knowingly engages in sexual penetration with a person who is at least fourteen years old but less than sixteen years old; provided that:
>
> (i) The person is not less than five years older than the minor; and
>
> (ii) The person is not legally married to the minor....

4. Minor 1 was born on April 18, 1989, and accordingly was 15 at the time of the incident charged in Counts 12 to 14. Minor 2 was born on January 29, 1993, and Minor 3 was about a year younger than Minor 2.

the Mars's residence at the end of March or beginning of April, 2004.

The Mars's house had two bedrooms and one bathroom on the first floor, and four bedrooms and one bathroom on the second floor. The Family rented two of the second floor bedrooms. The other two second floor bedrooms were a "TV/sleeping room" and "play room." Mars, Mars's girlfriend, and their daughter occupied one bedroom on the first floor. Ms. Mars, her friend, and Mars's girlfriend's son occupied the other first floor bedroom.

The first floor bathroom had a Jacuzzi tub. Ms. Mars told the Family that Mars was the only one who could start the Jacuzzi, so they had to ask him if they wanted to use it. Everyone in the house was allowed to use the toilet in the first floor bathroom.

Minor 1 complained to Mother that Mars was mean and controlling, that Mars tried to discipline Minor 1, and that Minor 1 did not want to be left alone with Mars. Mother asked Mars several times to leave Minor 1 alone and told Mars that it was not his job to discipline her children.

Mother described what she considered inappropriate remarks made by Mars while the Family lived in the Mars's house. In Mother's presence, Mars told Minors 1, 2, and 3 to pull up their pants and not show their underwear because there were "perverts" in the area. Mars told Minor 1 that he should be careful about his underwear because the intermediate school students "liked them." Mars also commented that Minor 1 "was largely hung and a lot of people would like that."

Minor 1 testified about two uncharged incidents involving Mars. The first occurred when Minor 1 attempted to dye his hair in the upstairs bathroom. Although Minor 1 did not want Mars's assistance, Mars offered to help him. Mars told Minor 1 to remove his clothing and wear a towel to avoid staining his clothes. Minor 1 did so. When Minor 1 stepped out of the shower after rinsing the dye out from his hair, Mars had returned to the bathroom and commented that Minor 1 had "too much hair down there."

The second incident occurred when Minor 1 was complaining about pain and Mars offered to check him for hemorrhoids. Minor 1 agreed, but testified that "[h]e had me take down my boxers and my pants and then he started feeling around in my testicle area—area without any gloves or anything on." According to Minor 1, Mars's examination lasted about two to three minutes.

Minor 1 then testified that Mars sexually assaulted him on five separate occasions. The first occasion occurred when Mars asked Minor 1 to get something from Mars's bedroom. Mars followed Minor 1 into the bedroom, then shut and locked the bedroom door. Mars then told Minor 1 that if he didn't cooperate and follow Mars's instructions, Mars would evict the Family from the house. Minor 1 testified that he knew his mother couldn't afford to pay rent at the time, and Minor 1 did not want to end up homeless, so he did as he was told. Mars proceeded to sexually assault Minor 1.

The second occasion again occurred in Mars's bedroom. While Minor 1 was watching TV, Mars pointed towards his bedroom. Minor 1 refused and Mars pointed again. Minor 1 felt that if he didn't go with Mars, Mars would act on his threat to evict the Family, so he complied. Once inside the bedroom, Mars again assaulted Minor 1.

The third occasion occurred in Minor 1's bedroom. Mother was not at home, and Minor 1 was sleeping in his room. Minor 1 awoke to find Mars pulling down Minor 1's shorts and boxers. Minor 1 attempted to get away, but Mars pushed him down and assaulted him.

The fourth occasion occurred while Mother was in the house. Minor 1 was helping Mars fix the upstairs bathroom door. Mars either pointed to the bathroom, or told Minor 1 to go into the bathroom, and closed the door. Mars again assaulted Minor 1.

When asked why he did not inform Mother about any of the above incidents, Minor 1 replied that he "didn't want to cause trouble[,] and plus I didn't want to get thrown out on the street." Minor 1 said that Mars had also threatened to kill him.

The fifth and final occasion occurred "around midnight" on August 14, 2004, or shortly thereafter on August 15, 2004. Mother testified that she and her husband (Father), who had joined the Family a few days earlier, were watching television on the second floor. Mother went to check on Minor 1, with whom she was having problems because he did not want to go to sleep. When Mother didn't find him in his bedroom, she went downstairs to look for Minor 1. Mother couldn't find Minor 1 in the common areas of the house. Mother went to the downstairs bathroom to check if Minor 1 was in it. Suspecting that Minor 1 was using the Jacuzzi, she knocked on the closed, locked door and told Minor 1 to open it. Hearing no response, Mother angrily knocked again and told Minor 1 to "open the F-ing door." Mother heard Minor 1 faintly reply, "it's occupied." Mother then "banged" on the door and again told Minor 1 to open it. The Jacuzzi turned on and Mars called out that he was using the bathroom and Minor 1 was in the shower.

At this point, Mother went upstairs and angrily told Father that Mars was with Minor 1 in a locked bathroom. After about five minutes, Mother went back downstairs, where she saw Mars walking out of the bathroom wearing only a towel wrapped around his waist. Mother waited for Minor 1 to exit the bathroom, but when he didn't she entered and found Minor 1 lying naked in the Jacuzzi tub, with an erection.

Mother took Minor 1 upstairs and, still angry, went downstairs to confront Mars. Father then followed Mother downstairs. He too was angry because Minor 1 had told him about the five incidents with Mars. After a brief physical altercation between Mother and Mars, Father called the police. After the police arrived, Mother and Father took Minor 1 to Kapiʻolani Medical Center.

Minor 1 testified that he had obtained permission from Mars and Mars's girlfriend to use the Jacuzzi in the first floor bathroom. Minor 1 did not lock the bathroom door because he felt it was not necessary, as a closed door meant that the bathroom was occupied. Minor 1 testified that while he was in the Jacuzzi, he heard footsteps and Mars, naked, opened the curtain. Mars sat down on the toilet and nodded at Minor 1, who stood up because he knew what Mars wanted. Minor 1 exited the Jacuzzi and Mars made him kneel. Mars inserted his penis into Minor 1's mouth, placed his mouth over Minor 1's penis, then made Minor 1 bend over the sink, where Mars inserted his penis into Minor 1's anus for about one minute. While Minor 1 was bent over the sink, he heard his mother knocking on the bathroom door and telling him to get out of the bathroom.

Minor 1 further testified that Mars then stopped and sat on the toilet, and Minor 1 returned to the Jacuzzi tub. Mars told Minor 1 to say "occupied," and Minor 1 did so. Mother then pounded on the bathroom door and yelled at Minor 1. Mars told Mother that the bathroom was occupied, and Mother went upstairs. After Mother went upstairs, Mars left the bathroom. Mother returned and told Minor 1 to get dressed and go upstairs, but Minor 1 did not tell Mother what had just occurred. Minor 1 did, however, tell his father about the five sexual assaults.

Minor 2 testified that on one occasion while he was using the bathroom, Mars entered and threatened to kill him if he did not "suck [Mars's] penis," so he complied. Minor 2 did not report the incident until after Mars was arrested, fearing that he would be blamed for the incident.

Mars's girlfriend testified that in the late evening hours of August 14, 2004/early morning hours of August 15, 2004, she and Mars were in bed in their shared bedroom. She was clothed but Mars was naked. Mars told her that he needed to use the bathroom, and she told Mars to use the upstairs bathroom because she heard the water running in the Jacuzzi tub in the downstairs bathroom. According to Mars's girlfriend, Mars also knew that Minor 1 had planned to use the Jacuzzi that night. She also testified that Mars did not tell her that he had "the runs" when he left to use the bathroom.

Mars walked out of the bedroom wearing only a towel wrapped around him. Mars was gone "for a little while" and when he returned to the bedroom, he repeated "I don't

need this" three times. Mars's girlfriend asked Mars what was wrong, but Mars didn't tell her. She tried to discover what happened, but then there was pounding on the door of the bedroom and yelling on the other side. Mars opened the door and Mother was there, yelling at him. Mother shoved Mars against the bed and he fell to the ground.

Mars testified in his own defense and denied having sexually assaulted Minor 1 or Minor 2. Mars testified that on the night of August 14, 2004, he and his girlfriend were talking in their bedroom. His stomach "started gurgling" so he told his girlfriend that he had to go to the bathroom. She told him to use the upstairs bathroom as he was heading out the door. Mars had been naked and wore a terry cloth towel because he wanted to be covered in case he met any of the Family upstairs. Mars felt that he couldn't make it to the upstairs bathroom "without having an accident," so he knocked on the door to the downstairs bathroom and receiving no response, entered. Mars testified that he figured that someone was using the tub in the bathroom because he and his girlfriend could hear the water running from their room. He could infer that it was Minor 1 because he and his girlfriend had given Minor 1 permission to use the Jacuzzi that night. Mars further testified that he immediately sat down to use the toilet. Minor 1 "peeked" out of the tub and asked Mars what Mars was doing.

Mars denied having locked the door to the bathroom and said that the lock could engage by itself if the door was slammed. He had finished using the toilet and had flushed when Mother started pounding on the bathroom door.

When Mars left the bathroom, he saw Mother and asked her if she wanted Minor 1 since she had been calling for him. Mother started cursing Mars. Mars re-entered his bedroom, took off the towel, and climbed back into bed. He recalled repeating "I don't need this shit," and felt that Mother had misinterpreted what had happened. Sometime later, Mother confronted Mars and shoved him backwards, causing him to fall and hit his back on a cinder block.

Dr. Nadine Salle (Dr. Salle), a physician at the Kapi'olani Sex Abuse Treatment Center (SATC) testified that she examined Minor 1 in the early morning of August 15, 2004. Dr. Salle took an oral history from Minor 1, then physically examined him. She stated that there was no visible trauma or injury to Minor 1's penis, nor any trauma to his anus or abnormalities with the surrounding area. Based on Minor 1's oral history of events, she did not expect to find injury to either area because "if it's not violent enough to tear anything, you will not see any trauma." When asked if the findings of her examination were consistent or inconsistent with Minor 1's oral history, she answered, "[v]ery consistent."

## II. POINTS OF ERROR

Mars raises four points of error. In the first two points, Mars argues:

1. The circuit court erred in precluding the defense from introducing extrinsic evidence that [Minor 1] lied to Dr. Salle during the medical examination about his prior sexual history when [Minor 1] was unable to recall whether he told Dr. Salle that his sexual activity with [Mars] was his only sexual experience.

....

2. The circuit court plainly erred in permitting the State's expert witness, Dr. Nadine Salle, to testify that her findings, which revealed no physical evidence of sexual abuse, were very consistent with [Minor 1's] oral history, thereby implicitly testifying that [Minor 1] was believable and that [Mars] had sexually abused him.

Mars also argues that the circuit court erred when it admitted evidence concerning (1) Mars's inappropriate comments regarding Minor 1's underwear and the size of Minor 1's genitals, (2) Mars's helping Minor 1 to dye his hair and telling Minor 1 that he had too much pubic hair, and (3) Mars's examination of Minor 1's testicles when Minor 1 complained of pain.

Mars finally argues that "[t]he prosecutor committed prosecutorial misconduct during

closing argument by making statements designed to inflame the passions and prejudice of the jury, thereby depriving [Mars] of his right to a fair trial."

## III. STANDARDS OF REVIEW

### A. Admissibility of Evidence

> Different standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.
>
> Where the evidentiary ruling at issue concerns admissibility based upon relevance, under [Hawaii Rules of Evidence (HRE) ] Rules 401 and 402, the proper standard of appellate review is the right/wrong standard.
>
> Evidentiary decisions based on HRE Rule 403, which require a "judgment call" on the part of the trial court, are reviewed for an abuse of discretion. The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

*Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 350–51, 944 P.2d 1279, 1293–94 (1997) (internal quotation marks, citations, and brackets omitted; block quote format changed).

### B. Abuse of Discretion

"Generally, to constitute an abuse, it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Crisostomo*, 94 Hawai'i 282, 287, 12 P.3d 873, 878 (2000) (internal quotation marks, citations, and brackets omitted).

### C. Plain Error/Rule 52(b)

Hawai'i Rules of Penal Procedure Rule 52(b) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Therefore, an appellate court "may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Staley*, 91 Hawai'i 275, 282, 982 P.2d 904, 911 (1999) (internal quotation marks and citation omitted).

The appellate court "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *State v. Vanstory*, 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999) (internal quotation marks and citation omitted).

> This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system-that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.

*Id.* (quoting *State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993)).

### D. Harmless Error

"A constitutional error is harmless so long as the court is able to declare a belief that it was harmless beyond a reasonable doubt." *Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan*, 87 Hawai'i 217, 245, 953 P.2d 1315, 1343 (1998) (internal quotation marks, citation, brackets, and ellipsis omitted).

The Hawai'i Supreme Court has stated that "[s]uch error, however, should not be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect to which the whole record shows it is entitled." *State v. Sprattling*, 99 Hawai'i 312, 320, 55 P.3d 276, 284 (2002) (internal quotation marks, citation, and brackets in original omitted). Under the harmless error standard, this court "must determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *State v. Pauline*, 100 Hawai'i 356, 378, 60 P.3d 306, 328 (2002) (internal quotation marks and citation omitted). "If there is such a reasonable possibility in a

criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside." *State v. Gano,* 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999) (internal quotation marks and citation omitted).

### E. Prosecutorial Misconduct

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *State v. Rogan,* 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999) (internal quotation marks and citations omitted) (quoting *State v. Sawyer,* 88 Hawai'i 325, 329 n. 6, 966 P.2d 637, 641 n. 6 (1998)).

"Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. McGriff,* 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, we consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." *State v. Agrabante,* 73 Haw. 179, 198, 830 P.2d 492, 502 (1992).

## IV. DISCUSSION

### A. Limitation on Impeachment

Prior to trial, the State of Hawai'i (the State) moved *in limine* to preclude Mars from introducing evidence of Minor 1's sexual orientation or sexual history. Defense counsel did not at that, or any other time, file an HRS Chapter 626, Hawaii Rules of Evidence (HRE) Rule 412(c)(1)[5] motion to introduce such evidence. During the January 9, 2006 pre-trial hearing on the State's motion, however, defense counsel objected to the State's motion and the following discussion took place:

> THE COURT: Well, with respect to the sexual orientation, do you intend to introduce evidence of the sexual orientation of the complaining witnesses?
>
> [Defense counsel]: Yes, sir.
>
> THE COURT: And can you give me an offer of proof specifically what you would introduce and by which witness?
>
> [Defense counsel]: Your Honor, when [Minor 1] and [Minor 2], when [Mother] was interviewed by the police, she told the police about a relationship that Minor 1 had with a next-door neighbor and this relationship that [Minor 1] had with the next-door neighbor was essentially a homo-

5. HRE Rule 412(c) provides:
(1) If the person accused of committing a sexual offense intends to offer under subsection (b) evidence of specific instances of the alleged victim's past sexual behavior, the accused shall make a written motion to offer the evidence not later than fifteen days before the date on which the trial in which the evidence is to be offered is scheduled to begin, except that the court may allow the motion to be made at a later date, including during trial, if the court determines either that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence or that the issue to which the evidence relates has newly arisen in the case. Any motion made under this paragraph shall be served on all other parties and on the alleged victim.
(2) The motion described in paragraph (1) shall be accompanied by a written offer of proof. If the court determines that the offer of proof contains evidence described in subsection (b), the court shall order a hearing in chambers to determine if the evidence is admissible. At the hearing, the parties may call witnesses, including the alleged victim, and offer relevant evidence. Notwithstanding subsection (b) of rule 104, if the relevancy of the evidence that the accused seeks to offer in the trial depends upon the fulfillment of a condition of fact, the court, at the hearing in chambers or at a subsequent hearing in chambers scheduled for this purpose, shall accept evidence on the issue of whether the condition of fact is fulfilled and shall determine the issue.
(3) If the court determines on the basis of the hearing described in paragraph (2) that the evidence that the accused seeks to offer is relevant and that the probative value of the evidence outweighs the danger of unfair prejudice, the evidence shall be admissible in the trial to the extent an order made by the court specifies evidence that may be offered and areas with respect to which the alleged victim may be examined or cross-examined.

sexual relationship, and [Mother] told the police that [Minor 1] had engaged in consensual sex with the next-door neighbor and that the sexual conduct between [Minor 1] and the neighbor included penetration.

Defense counsel advised the court that this evidence would be offered to show that any injury to Minor 1's anal area was due to sexual contact with his neighbor, and not from an assault by Mars. Defense counsel's offer of proof was a statement made by Mother to the police stating that Minor 1 had admitted having sex with his neighbor, but that Mother had not provided any specific date of that occurrence.

The State advised the court that it would not be offering any evidence of injury to Minor 1 because the alleged injury was an "anal spasm," not an injury, and that this was a common reaction to a rectal exam. The court ruled that since no evidence of injury would be offered by the prosecution, any such testimony "would have no relevance...." Defense counsel then argued an alternate theory, that Minor 1 was able to describe the sexual acts because of his relationship with his neighbor. The court declared: "I'm unpersuaded by that argument.... Even assuming it had some slight relevance on a[n HRE Rule] 403 analysis, the prejudice outweighs any probative value."

Defense counsel next proposed to introduce evidence of Minor 1's sexual activity with his neighbor to impeach a statement made by Minor 1 to Dr. Salle that Minor 1's sexual experiences with Mars were his only sexual experiences.[6] The court ruled that the defense could inquire into Minor 1's statement to Dr. Salle for the limited purpose of impeaching Minor 1's credibility, i.e., showing that he lied to Dr. Salle when he stated that he had not had previous sexual encounters. The court held that the cross examination would be limited as follows: If Minor 1 admitted that he had a previous sexual encounter, contrary to his statement to Dr. Salle, then the cross examination would end; if Minor 1 denied it, then the court would further consider what evidence the defense would be allowed to introduce.

At trial, Dr. Salle testified that she asked Minor 1 whether he had any prior sexual encounters before the alleged assault, and that Minor 1 had answered the question. However, defense counsel did not ask Dr. Salle what Minor 1's response was.

During Minor 1's testimony, defense counsel asked the following questions:

Q. And do you recall telling the doctor that this was your only experience with sex?

A. No.

Q. Do you recall the doctor asking you your history?

A. No, but then—

Q. In this area?

A. No, but it's been a year so I don't remember everything she asked me.

Q. Because you wouldn't lie to the doctor, would you?

A. No. But I was scared at the time.

Defense counsel then asked for a sidebar conference, and advised the court:

[Defense counsel]: I'm in a difficult position because my impeachment ... would be ... to have the doctor describe the fact that [Minor 1] told her that he had no prior experiences with sex but I'm unable to do that right now because I don't have the doctor here.

THE COURT: ... the doctor already testified regarding that matter and you elicited the testimony that you wanted, that [Minor 1] indicated that he had no other sexual encounter. You asked him whether he made the statement; he said no. He also said he cannot recall everything he might have said—

....

THE COURT:—to her so I don't see the need for the doctor at this point but if you're looking for an inconsistent statement, you have it already.

[Defense counsel]: Okay. And the court will not allow me to delve further into this issue?

6. Defense counsel referred to a written report by Dr. Salle documenting the oral history that she had taken when she examined Minor 1 on August 15, 2004.

THE COURT: No.[7]

There was no further discussion of the court's ruling during the evidentiary phase of the trial, and the defense did not seek to recall Mother or Dr. Salle when it presented its case. In closing argument, defense counsel stated that "[i]nnocent people get convicted when someone like [Minor 1] lies to the doctor about his past, okay, because you heard the doctor say that she asked [Minor 1] whether or not this was his first sexual experience and she's talking about his sexual experience with [Mars] and you heard that Minor 1 lied to her," and "[Minor 1] lied to the doctor and the doctor took his word for it in coming to her conclusion."

On appeal, Mars argues that the circuit court erred when it did not allow him to introduce extrinsic evidence to show that "[Minor 1] lied to Dr. Salle during the medical examination about his prior sexual history when [Minor 1] was unable to recall whether he told Dr. Salle that his sexual activity with [Mars] was his only sexual experience." Mars argues that this ruling did not allow him to present "a complete defense" and his constitutional right to due process was violated because he was then unable to attack Minor 1's credibility with evidence of Minor 1's admission to Mother that he had previously had sexual relations with his neighbor. Mars asserts that defense counsel "first should have been permitted to lay foundation and ask [Minor 1] whether he did engage in prior sexual activity with someone other than [Mars]." Mars contends that if Minor 1 had admitted to prior sexual activity, Mars would have then called Dr. Salle to testify that Minor 1 had denied such activity; if Minor 1 denied such activity, then Mars would have called Dr. Salle to testify regarding Minor 1's denial and Mother to testify regarding Minor 1's statement to her that he had engaged in consensual anal sex with his neighbor.

The State counters that (1) evidence of Minor 1's prior sexual behavior should have been excluded entirely under HRE Rule 412;[8] (2) that defense counsel failed to lay the proper foundation for such evidence, because defense counsel failed to ask Dr. Salle what Minor 1 said to her about his prior sexual experiences; and (3) Mars's claim that his "due process right to present a complete defense was impaired has no merit where, despite the fact that impeachment never occurred, counsel nevertheless argued as if it had to the jury in closing argument."

We begin by considering the second and third of the State's arguments. We reject the State's contention that we should affirm because defense counsel argued in his closing that Minor 1 had lied to Dr. Salle. The jury is presumed to have followed the court's instructions. *State v. Jhun,* 83 Hawai'i 472, 482, 927 P.2d 1355, 1365 (1996). The jury here was instructed that "[s]tatements or remarks made by counsel are not evidence. You should consider their arguments to you, but you are not bound by their recollections or interpretations of the evidence." Thus, the jury is presumed to have relied on its own recollection of the evidence, rather than defense counsel's misstatements.

We also reject the State's argument that we should affirm because Mars failed to lay the proper foundation to impeach Minor 1. Although defense counsel failed to ask Dr. Salle what Minor 1 said to her about his prior sexual experiences, we do not believe

7. The circuit court erred in its recollection of the testimony of Dr. Salle, because defense counsel did not ask Dr. Salle what Minor 1 said about having prior sexual experiences, nor had Dr. Salle volunteered the information.

8. HRE Rule 412 states, in relevant part:

Sexual offense and sexual harassment cases; relevance of victim's past behavior.

....

(b) Notwithstanding any other provision of law, in a criminal case in which a person is accused of a sexual offense, evidence of an alleged victim's past sexual behavior other than reputation or opinion evidence is not admissible to prove the character of the victim to show action in conformity therewith, unless the evidence is:

(1) Admitted in accordance with subsection (c)(1) and (2) and is constitutionally required to be admitted; or

(2) Admitted in accordance with subsection (c) and is evidence of:

(A) Past sexual behavior with persons other than the accused, offered by the accused upon the issue of whether the accused was or was not, with respect to the alleged victim, the source of semen or injury....

that defense counsel was required to ask that question during the prosecution's case, as opposed to calling Dr. Salle as part of the defense case after Minor 1 had testified. Indeed, the circuit court's ruling on the motion in limine appeared to contemplate that Dr. Salle would not be asked that question until after Minor 1 had testified.

We turn next to the State's argument that evidence about Minor 1's prior sexual experiences was properly excluded because it was inadmissible under HRE 412.[9] Although the circuit court had ruled prior to trial that it intended to allow such evidence for the purpose of impeaching Minor 1, its response to defense counsel's sidebar comments during Minor 1's testimony appeared to foreclose its introduction. That ruling was based on the circuit court's incorrect recollection of Dr. Salle's testimony. But even if the reasoning underlying the ruling was faulty, we can affirm the ruling if in fact it was the correct result. *State v. Taniguchi,* 72 Haw. 235, 240, 815 P.2d 24, 26 (1991) ("[W]here the decision below is correct it must be affirmed by the appellate court even though the lower tribunal gave the wrong reason for its action.") (citing *State v. Rodrigues,* 68 Haw. 124, 134, 706 P.2d 1293, 1300 (1985) (other citations omitted)).

In *State v. Balisbisana,* 83 Hawai'i 109, 924 P.2d 1215 (1996), the Hawai'i Supreme Court considered whether a defendant charged with abusing a household member had been improperly precluded from cross-examining the complaining witness about her prior conviction for harassing the defendant. The defendant argued that such impeachment would have tended to show that the complaining witness had a motive to falsify the allegation against the defendant, i.e., a desire to obtain revenge for her own conviction. *Id.* at 115, 924 P.2d at 1221. In analyzing whether the trial court had abused its discretion, the supreme court noted:

> The scope of cross-examination is generally within the sound discretion of the trial court. While the right of cross-examination protected by the Confrontation Clause of the Sixth Amendment may not be unduly restricted, it has never been held that this right is absolutely without restriction. However, the trial court's discretion in exercising control and excluding evidence of a witness's bias or motive to testify falsely becomes operative only after the constitutionally required threshold level of inquiry has been afforded the defendant. The Sixth Amendment is satisfied where sufficient information is elicited to allow the jury to gauge adequately a witness' credibility and to assess his [or her] motives or possible bias. When the trial court excludes evidence tending to impeach a witness, it has not abused its discretion as long as the jury has in its possession sufficient information to appraise the biases and motivations of the witness.

*Id.* at 114, 924 P.2d at 1220 (citations, quotation marks, and ellipses omitted) (brackets in original).

The Hawai'i Supreme Court concluded that the circuit court had abused its discretion and noted that "[t]he appropriate inquiry . . . is whether the jury had sufficient information from which to make an informed appraisal of [the complaining witness's] motives and bias, absent evidence of her conviction. . . ." *Id.* at 116, 924 P.2d at 1222. It

9. Although the State argues that the admission of the evidence was precluded by HRE 412, we believe the applicable rule in these circumstances is HRE 403, which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." HRE 412, as amended in 1992, precludes evidence of prior sexual activity offered to show "action in conformity therewith" by the victim. One commentator has noted that as a result of this amendment, "when offered for other purposes, evidence of the victim's prior sexual behavior will be governed by the general principles of rule 403 rather than the shield of rule 412." Addison M. Bowman, *Hawai'i Rules of Evidence Manual* § 412-1[1] (3d ed.2006). In the instant case, Mars did not seek to introduce the evidence to suggest that Minor 1 had engaged in consensual sexual activity with Mars; rather it was offered to impeach Minor 1 by suggesting he had lied to Dr. Salle. *See id.* (use of evidence of prior sexual activity to impeach a witness is "outside the current exclusion" of HRE 412, but HRE 403 "has a part to play in the final determination of admissibility").

concluded that the jury did not have enough such information. *Id.* at 117, 924 P.2d at 1223.

There are no Hawai'i cases which directly address the situation here, i.e., the impeachment of a sex assault victim based on allegedly false, out-of-court statements to a treating physician regarding the victim's prior sexual experiences. Our supreme court has recognized that the prosecution can open the door to impeachment concerning a sexual assault victim's prior sexual conduct by eliciting testimony from the victim that implies the victim did not have any prior sexual experiences. *State v. Calbero,* 71 Haw. 115, 126, 785 P.2d 157, 162 (1989) ("Whether or not the complaining witness had had past sexual experience was relevant only to the extent the State, by eliciting [the complaining witness'] answer ... had injected her past experience into the trial."). However, no such testimony was elicited by the prosecution here.

Although our supreme court has not yet directly addressed this specific situation, courts in other jurisdictions have done so. In *Jones v. Goodwin,* 982 F.2d 464 (11th Cir.1993), defendant Russell Lee Jones claimed that the trial court denied his constitutional right of confrontation by excluding evidence that (1) the rape victim had lied to her treating doctor by stating that she had been a virgin prior to the assault, and (2) the treating doctor had determined that the victim's hymen was not intact prior to the rape. *Id.* at 469–70. Jones argued that he should have been allowed to impeach the victim's credibility by introducing both pieces of evidence. *Id.* The Eleventh Circuit ruled that "[b]ecause the jury received no evidence as to Keys' pre-rape virginity, Jones' desire to impeach Keys' out of court virginity statement is of no constitutional moment; Jones merely sought to establish that Keys previously had told an out of court lie. The trial court correctly excluded Jones' proffered evidence because it would have impeached nothing." *Id.*

Similarly, in *United States v. White Buffalo,* 84 F.3d 1052 (8th Cir.1996), defendant Ernest White Buffalo contended that the district court violated his constitutional right to impeach the alleged rape victim's credibility. *Id.* at 1054. White Buffalo contended that the victim lied to her treating doctor by saying that she did not have sexual intercourse within the seventy-two hours prior to the rape, when the laboratory results of a test for semen suggested otherwise. *Id.* White Buffalo proposed to offer the victim's denial of earlier sexual intercourse and then introduce the test results to impeach her credibility. *Id.* at 1053. The district court ruled the evidence inadmissible under Federal Rules of Evidence (FRE) Rule 412. *Id.* at 1054. The Eighth Circuit held that "[b]ecause the victim's statement about unrelated consensual sexual intercourse was of little or no probative value on the question of whether she falsely accused Ernest of rape, the exclusion of the test results did not deprive Ernest of a constitutional right." *Id.; see Kemp v. State of Florida,* 464 So.2d 1238, 1240 (Fla.Dist.Ct.App.1985) (rape victim falsely told the examining physician that she was a virgin; court holds that evidence about that false statement was not "relevant and material to any issue...."); 23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5387 at 576–77 (1980) ("The difficulty with a blanket endorsement of specific contradiction in the context of sexual history is that this might permit the defense to circumvent [FRE Rule 412] by asking the victim about some irrelevant fact solely for the purpose of empeaching [sic] her with evidence of prior sexual behavior."). *But see State v. LaClair,* 121 N.H. 743, 433 A.2d 1326 (1981) (evidence that rape victim either lied to a law enforcement officer that she had been a virgin prior to the rape, or lied during a deposition while under oath that she had not been a virgin, was admissible since her inconsistent statements under the circumstances cast some doubt on her credibility).

It was not an abuse of discretion for the trial court here to refuse to allow Minor 1 to be impeached by evidence that he had falsely denied having prior sexual experiences when he was interviewed by Dr. Salle. Such evidence would have had limited probative value given the circumstances of the statement, i.e., a 15 year old being asked intimate questions

by a stranger. Moreover, it would have been cumulative, since the trial court had allowed Mars significant latitude in impeaching Minor 1 with prior instances of untruthfulness. For example, defense counsel asked Minor 1:

Q. Now [Minor 1], you—you have struggled with being honest over the years, correct?

A. I'm a teenager. All teenagers lie or don't tell the truth at times.

Q. And you haven't always told the truth to your grandmother?

A. I told the truth—I can tell the truth to both of my grandmothers. I know when I lie and don't tell the truth.

Q. Your grandmother has been upset with you because you've lied to her?

A. Yes.

Q. Yes. There were times when you haven't been honest with your own mother and father, correct?

A. Yes.

Q. And your brothers?

A. Yes.

Q. And there have been times when you were not honest with Angie Pinho, correct?

A. Yes.

Q. And you were not honest with [Mars]?

A. Yes.

In addition to being cumulative, the excluded evidence would have been unduly prejudicial and confusing since it would have focused the jury's attention on Minor 1's prior sexual history. Thus, we conclude that the circuit court did not abuse its discretion in limiting Mars's cross-examination on this issue.

Moreover,

> Violation of the constitutional right to confront adverse witnesses is subject to the harmless beyond a reasonable doubt standard. In applying the harmless beyond a reasonable doubt standard the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction.

*Balisbisana,* 83 Hawai'i at 113–14, 924 P.2d at 1219–20 (citations omitted). In *Balisbisana,* the court explained:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* at 117, 924 P.2d at 1223 (citation omitted).

The court concluded that the denial of cross examination regarding the complaining witness' possible motive for testifying falsely was not harmless since "the prosecution's case rested solely on [complaining witness's] testimony...." *Id.* at 117, 924 P.2d at 1223.

In contrast to the result in *Balisbisana,* the Hawai'i Supreme Court found that the denial of cross examination concerning a witness's motives or bias was harmless error in *State v. Birano,* 109 Hawai'i 314, 126 P.3d 357 (2006). The defendant there was convicted of robbery and other charges after he used a handgun to demand money from the victim, Dumlao, while in the company of two co-defendants, Nakano and Takara. *Id.* at 318, 126 P.3d at 361. Nakano pleaded no contest and was scheduled to testify at Birano's trial, but invoked his fifth amendment right to remain silent. *Id.* at 318, 126 P.3d at 361. After the circuit court held a conference in chambers with Nakano and his attorney, but without Birano or his attorney being present, Nakano decided to testify. *Id.* at 318, 126 P.3d at 361. However, the circuit court precluded Birano's counsel from questioning Nakano about why he had initially declined, and then decided, to testify. *Id.* at 318, 126 P.3d at 361.

On appeal, the Hawai'i Supreme Court assumed *arguendo* that the circuit court erred

in denying cross examination on that issue, but further found that the denial was harmless. *Id.* at 325–26, 126 P.3d at 368–69. The supreme court emphasized that the circuit court had allowed substantial cross examination regarding Nakano's motive to testify, i.e., the desire to get a more favorable sentence, and further noted that unlike the situation in *Balisbisana*, "Nakano was not the only witness to the event, and the conviction did not rest on his credibility alone." *Id.* at 325–26, 126 P.3d at 368–69.

Applying these principles here, we find that any error by the circuit court was harmless beyond a reasonable doubt. As noted above, the evidence was cumulative since Mars was allowed considerable latitude in impeaching Minor 1 based on other prior instances of untruthfulness. *Cf. Birano,* 109 Hawai'i at 325, 126 P.3d at 368. Moreover, there was substantial evidence, in addition to Minor 1's testimony, to support the conviction of Mars for the events on the night of August 14–15, 2004. *Cf. id.* at 325, 126 P.3d at 369. Minor 1's account of the events of that evening was corroborated in part by the testimony of Mother and Mars's girlfriend, as well as by that of Mars. Mother found Minor 1 alone in a locked bathroom with Mars in the middle of the night; Mars came out of the bathroom wearing only a towel, and Minor 1 had an erection when Mother entered the bathroom. When Mother initially pounded on the door, she was met first by silence, then by a meek "it's occupied" from Minor 1. When she kept pounding, she heard the sound of the Jacuzzi turning on, and then Mars's explanation that he was using the bathroom and Minor 1 was in the shower.

There was also substantial evidence that Mars chose to enter the bathroom, knowing that Minor 1 was inside. Mars's girlfriend testified that she told Mars to use the upstairs bathroom because she heard the water running in the Jacuzzi tub in the downstairs bathroom and she knew that Minor 1 had permission to use the tub that night. She also testified that Mars also knew that Minor 1 had planned to use the Jacuzzi that night. Although Mars claimed during his testimony that he used the downstairs bathroom because he didn't think he could make it upstairs, his girlfriend testified that he did not tell her that he had "the runs" when he left to use the bathroom. Mars testified that his girlfriend had told him to use the upstairs bathroom, and that he knew that someone, whom he could infer was Minor 1, was using the Jacuzzi in the downstairs bathroom because he and his girlfriend could hear the Jacuzzi from their room and they had given Minor 1 permission to use the Jacuzzi that night.

Moreover, Mars had no explanation for the door being locked other than that it had, in the past, locked itself if it was slammed.

In sum, there was substantial independent evidence that corroborated Minor 1's testimony about Mars's conduct on the night in question. Indeed, it is noteworthy that the jury convicted Mars on the three counts that related to that evening, but acquitted him on the charges that related to other incidents for which there was less corroborating evidence. The verdict suggests that, given Mars's efforts to impeach Minor 1's credibility, the jury relied on the existence of independent evidence in convicting Mars on counts 12–14, and the lack of such evidence in acquitting him of the other counts. It is highly unlikely that the additional impeachment of Minor 1 regarding his statement to Dr. Salle would have changed the jury's assessment of the evidence in the case. Thus, we cannot conclude that there was a reasonable possibility that any error by the circuit court contributed to Mars's conviction, and any error was accordingly harmless.

### B. Improper Bolstering of Credibility

Mars next asserts that the circuit court plainly erred by permitting Dr. Salle to testify that her findings in her physical examination of Minor 1 were "[v]ery consistent" with Minor 1's oral history, "thereby implicitly testifying that [Minor 1] was believable." Mars asserts that "Dr. Salle's testimony served to improperly bolster the credibility of [Minor 1], and thereby invaded the province of the jury." Defense counsel did not object to Dr. Salle's testimony at trial.

The testimony in question arose at the end of the State's examination of Dr. Salle, and consisted of the following:

Q: And, finally, [Dr. Salle], do you have an opinion to a reasonable degree of medical certainty whether your findings were consistent or inconsistent with [Minor 1's] oral history to you?

A: Very consistent.

Mars's counsel then revisited the issue during his cross examination of Dr. Salle:

Q: You observed no trauma whatsoever to [Minor 1]?

A: No.

Q: And despite the fact that you have all the resources of the Kapiolani Center—

. . . .

Q:—there was no physical evidence to corroborate what [Minor 1] was saying?

A: Actually, the physical evidence does not dispute what he says. Did you—it's consistent with his story.

Q: So no injury is consistent with his story?

A: Yes.

. . . .

Q. And injuries could corroborate a patient's account?

A. Yes.

Q. And in this case there were no injuries whatsoever?

A. And he made no statement of an injury so his physical exam was consistent with his history.

In *State v. Batangan,* 71 Haw. 552, 799 P.2d 48 (1990), the Hawai'i Supreme Court held that the circuit court had improperly admitted expert testimony by a clinical psychologist in a child sex abuse case. *Id.* at 558, 799 P.2d at 52. The court stated that "[t]he pertinent consideration is whether the expert testimony will assist the jury without unduly prejudicing the defendant." *Id.* at 558, 799 P.2d at 52. The court further stated that "conclusory [expert] opinions that abuse did occur and that the child victim's report of abuse is truthful and believable is of no assistance to the jury, and therefore, should not be admitted." *Id.* at 558, 799 P.2d at 52.

As the Georgia Court of Appeals noted in *Odom v. State,* 243 Ga.App. 227, 531 S.E.2d 207 (2000):

> [T]here is absolutely nothing wrong with expert opinion testimony that bolster's [sic] the credibility of the indicted allegations of sexual abuse, e.g., the victim's physical examination showed injury consistent with sexual abuse, or the victim's psychological evaluation was consistent with sexual abuse. Establishing the credibility of the indicted acts of sexual abuse is what the State's case is all about and is the purpose for such expert testimony in the first place; the fact that such testimony may also indirectly, though necessarily, involve the child's credibility does not render it inadmissible.
>
> What is forbidden is expert opinion testimony that "directly addresses the credibility of the victim," i.e., "I believe the victim; I think the victim is telling the truth," or expert opinion testimony that implicitly goes to the ultimate issue to be decided by the jury, when such issue is not beyond the "ken" of the average juror, i.e., "In my opinion, the victim was sexually abused." Although the distinction may seem fine to a layman, there is a world of legal difference between expert testimony that "in my opinion, the victim's psychological exam was consistent with sexual abuse," and expert testimony that "in my opinion, the victim was sexually abused." In the first situation, the expert leaves the ultimate issue/conclusion for the jury to decide; in the second, the weight of the expert is put behind a factual conclusion which invades the province of the jury by providing a direct answer to the ultimate issue: was the victim sexually abused?

*Id.* at 208–9 (footnote, citations, some quotation marks, and some brackets omitted).

Here, Dr. Salle testified that her medical finding that Minor 1 had no injuries was "[v]ery consistent" with his oral account of what Mars had done to him. She did not testify as to whether Minor 1 was "truthful and believable." *Cf. Batangan,* 71 Haw. at 558, 799 P.2d at 52. Dr. Salle's statement, while supporting Minor 1's claim that he was sexually abused, did not rise to the level of

testimony that Minor 1 was telling the truth or that Minor 1 had been abused. Accordingly, the circuit court did not plainly err by admitting the testimony.

### C. Testimony Regarding Mars's Inappropriate Comments and Prior Incidents Concerning Mars and Minor 1

Mars argues that evidence of improper comments made by Mars regarding Minor 1 and the incidents involving dyeing Minor 1's hair and examining Minor 1's testicles was irrelevant and, although not objected to at trial, its admission constituted plain error. Mars argues that such evidence was offered for the sole purpose of showing that he was of bad character and acted in conformance with his bad character. *See* HRE Rules 401, 402, 403, and 404(b).

Contrary to Mars's suggestion, the evidence concerning his prior actions and comments was relevant and not unduly prejudicial, and was therefore admissible under HRE 404(b). This case is similar to *State v. Torres,* 85 Hawai'i 417, 945 P.2d 849, (App. 1997), where the defendant was accused of having digitally penetrated the vagina of his nine-year-old niece while giving her a bath. *Id.* at 419, 945 P.2d at 851. At trial, the prosecution introduced evidence of several prior incidents involving the defendant. *Id.* at 421, 945 P.2d at 853. On one occasion, the defendant told the victim "let's go someplace and make love." *Id.* at 422, 945 P.2d at 854. On other occasions, defendant had kissed the victim and had stuck his tongue into her mouth. *Id.* at 422, 945 P.2d at 854. On yet other occasions, the defendant took the victim into her cousin's room and tried to lay on top of her. *Id.* at 419, 945 P.2d at 851.

On appeal, the defendant argued that the trial court abused its discretion in admitting the evidence. *Id.* at 421, 945 P.2d at 853. This court held that the evidence was relevant and that its probative value was not outweighed by undue prejudice, noting that the defendant's comments and actions were "relevant to show Defendant's motive, purpose, and intent to sexually penetrate Complainant when he bathed her." *Id.* at 422, 945 P.2d at 854; *see also State v. Clark,* 83 Hawai'i 289, 301, 926 P.2d 194, 206 (1996) ("prior incidents of domestic violence between Diana and Clark showed the jury the context of Diana's relationship with Clark" and were therefore relevant).

The reasoning of *Torres* is directly applicable here. The evidence was relevant to show Mars's motive, purpose, and intent when he joined Minor 1 in the bathroom on the evening of August 14–15, 2004. Moreover, the nature of the prior statements and conduct by Mars was not highly inflammatory or otherwise unduly prejudicial so as to outweigh its probative value. Thus, we conclude that the evidence was admissible under HRE 404(b), and that the circuit court did not commit plain error in admitting it.

### D. Prosecutorial Misconduct

Finally, Mars argues that his convictions should be vacated "because the prosecutor's appeal to the emotions of the jury and plea for sympathy for the child complainants during closing argument constituted prosecutorial misconduct." Specifically, Mars challenges the following remarks made by the prosecutor in his closing: "And so as you assess the credibility of witnesses, remember this: that this community is measured by how we treat its weakest members. And who are the weak? The powerless? Those without a voice? Children."

Mars also challenges the following remarks made by the prosecutor in his rebuttal closing: "[E]vil prevails when good people do nothing. If there's one thing that the defense and I can agree on is that you have been selected because you are good people. What are you going to do about it?"

Because Mars's counsel did not object to these remarks, we must determine whether the alleged misconduct constituted plain error that affected Mars's substantial rights. *State v. Iuli,* 101 Hawai'i 196, 208, 65 P.3d 143, 155 (2003) (citation omitted) ("Because Iuli did not object to the prosecutor's alleged misconduct at trial, this court must, as a threshold matter, determine whether the alleged misconduct constituted plain error that affected Iuli's substantial rights."). In so doing, the court considers "the nature of the alleged misconduct, the promptness or

lack of a curative instruction, and the strength or weakness of the evidence against the defendant." *Id.* at 208, 65 P.3d at 155 (citations omitted).

During closing arguments,

> [A] prosecutor is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence. In other words, closing argument affords the prosecution (as well as the defense) the opportunity to persuade the jury that its theory of the case is valid, based upon the evidence adduced and all reasonable inferences that can be drawn therefrom.

*State v. Rogan,* 91 Hawai'i 405, 412–13, 984 P.2d 1231, 1238–39 (1999) (internal quotation marks and citation omitted).

We begin by reviewing the prosecutor's remarks in his rebuttal closing. These remarks were made in apparent response to defense counsel's theme in his closing argument that "innocent people get convicted when. . . ." For example, defense counsel argued that "[i]nnocent people get convicted when no evidence turns into evidence," "[i]nnocent people get convicted when someone like Minor 1 lies to the doctor about his past," "[i]nnocent people get convicted for something they didn't do when others jump on the bandwagon," and "[i]nnocent people get convicted when others take advantage of the situation." Finally, defense counsel argued that "[p]eople, innocent people get convicted, and no offense here, but innocent people get convicted when jurors don't follow the oath that you all have taken to hold [the prosecutor] to his burden of proof."

In his rebuttal closing, the prosecutor argued:

> Defense counsel would have you marching off into the jury deliberation room to the cadence of innocent people are convicted when, and you fill in the blank, to which the prosecution responds, guilty people are acquitted when jurors obsess over nonexistent evidence or become concerned with irrevelant [sic] arguments. And that is precisely what the defense offers up as a smokescreen: irrevelance [sic] and non-existence.
>
> Let me touch on a few of these things.
>
> . . . .
>
> Allow me then to conclude with this. The trial in this case rests on your willingness to believe two boys who have no reason to lie to you versus the self-serving testimony of a child molester who has no reason to tell you the truth. Who are you going to believe? What are you going to believe? And whose voice will you hear?
>
> Ladies and gentlemen of the jury, evil prevails when good people do nothing. If there's one thing that the defense and I can agree on is that you have been selected because you are good people. What are you going to do about it? Thank you.

Prosecutors have latitude to respond in rebuttal closing to arguments raised by defense counsel in their closing. *People v. Sutton,* 260 Ill.App.3d 949, 197 Ill.Dec. 867, 631 N.E.2d 1326, 1335 (1994) ("The prosecution may base its closing argument on the evidence presented or reasonable inferences therefrom, respond to comments by defense counsel which invite or provoke response, denounce the activities of defendant and highlight inconsistencies in defendant's argument.").

*Sutton* was cited by the Hawai'i Supreme Court in *State v. Clark,* 83 Hawai'i 289, 304–305, 926 P.2d 194, 209 (1996) as support for the proposition that "[i]t is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence."

Viewed in context, and considering the rebuttal closing in its entirety, we do not conclude that the prosecutor's comments here constituted misconduct. Defense counsel argued that there were many inconsistencies and missing pieces of evidence which demonstrated Mars's innocence; the prosecutor responded that those concerns were irrelevant and that the jury should focus on the evidence of Mars's guilt. While the reference to what "good people" should do would be

problematic in the abstract, in this context it did not constitute plain error. *Cf. State v. Schmidt,* 84 Hawai'i 191, 201–02, 932 P.2d 328, 338 (1997) (prosecutor's comment that "[t]he people of this community are also entitled to something[,]" when viewed in context of an otherwise proper argument, was not error).

We turn next to the prosecutor's suggestion in his closing that "[t]his community is measured by how we treat its weakest members." This statement was made as part of an argument about assessing the credibility of Minor 1 and Minor 2:

> Ladies and gentlemen of the jury, this case really boils down to one thing: Your willingness to believe two boys who have no reason to lie to you. What do they get out of this? Fame? Fortune?
>
> Quite the contrary.
>
> After being sexually assaulted by this defendant who ensured their silence with threats, all they have is enduring shame for the misfortune of having to live with him. And so as you assess the credibility of witnesses, remember this: that this community is measured by how we treat its weakest members.
>
> And who are the weak? the powerless? those without a voice? Children.
>
> [Minor 1] and [Minor 2] only have one goal in this case and that's to be believed. And so those things that were happening in secret have been made clear in broad daylight. And so who will hear them? Will it be you? Will it be you? Will it be you?
>
> I'm here to tell you as the prosecutor because it has to be all of you, and as you decide who's telling the truth, I invite you to remember the instructions given by Judge Del Rosario.

The prosecutor's remark about "[t]his community is measured by how we treat its weakest members" was improper, since it appeared to invite the jury to base its verdict on considerations other than the evidence in the case. However, the remark was made as part of an otherwise appropriate argument concerning assessing the credibility of the witnesses in light of the factors set forth in the court's jury instructions. Moreover, as we noted in section IV.A above, there was strong evidence in addition to Minor 1's testimony to support the convictions of Mars for the events of the night of August 14–15, 2004, which formed the basis of counts 12–14. Considering the isolated nature of the prosecutor's improper comment, and the strength of the evidence against Mars, we cannot say that Mars's substantial rights were affected.

## V. CONCLUSION

The May 17, 2006 Judgment of Conviction and Sentence is affirmed.